Argued and submitted August 7, 2001, reversed and remanded February 12, 2003

# HARRISBURG EDUCATION ASSOCIATION,
*Respondent,*

*v.*

# HARRISBURG SCHOOL DISTRICT #7,
*Petitioner.*

## UP-59-98; A110681

63 P3d 1176

Joel S. DeVore argued the cause for petitioner. With him on the briefs was Luvaas, Cobb, Richards & Fraser, P.C.

Thomas K. Doyle argued the cause for respondent. With him on the brief was Smith, Gamson, Diamond & Olney.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

**LINDER, J.**

In 1998, three teachers in Harrisburg School District #7 (the district) retired at the end of the school year. In doing so, they took advantage of a provision in the collective bargaining agreement (CBA) between the district and the Harrisburg Education Association (association) that provides for an early retirement incentive in the form of a monthly stipend and insurance benefits for teachers who voluntarily retire before age 65. The district determined the amount of the monthly stipend based on its understanding of the calculation specified by the CBA, which the association disputed. The association filed an unfair labor practices complaint with the Employment Relations Board (ERB), alleging that the district's calculation breached the CBA. *See* ORS 243.672(1)(g). ERB agreed with the association and, in effect, ordered the district to pay the retired teachers a stipend based on the association's method of calculation, plus interest. The district seeks judicial review of ERB's order. We reverse and remand.

We take the relevant facts from the record and ERB's order. We begin with the facts surrounding the negotiation and drafting of the early retirement incentive in the CBA because, as we later explain, those facts bear on our analysis. We then describe the dispute that arose as a result of the 1998 retirements.

In 1996, several smaller Harrisburg school districts merged into a single, larger one. In the spring of 1996, the parties began negotiations for a new collective bargaining agreement that would be in place from August 1996 through June 1999. In late July or early August, after most of the negotiations had been completed, the association proposed adding an early retirement incentive provision similar to one that, before the merger, had been in place for the teachers at Harrisburg Elementary School. In concept, the basic proposal was to encourage early retirement by providing teachers with a minimum monthly stipend, plus full family insurance benefits, until the retiree qualifies for Medicare (*i.e.,* reaches age 65). The district could fund the stipend and insurance benefits through the savings it would realize by

replacing more experienced, higher-paid teachers with newer, lower-paid teachers. The district did not immediately agree to the association's proposal because it was concerned that the financial obligations it could incur might require it to lay off teachers if its financial situation later worsened. As a result of that concern, the parties agreed that the district should have the ability to cease paying early retirement benefits if changes in its financial situation required it to reduce personnel.

The district attempted to reduce the proposal to writing for inclusion in the CBA. As initially drafted, the voluntary retirement incentive provided for a minimum monthly stipend of $225, an additional monthly stipend of between $50 and $100 for unused sick leave, and full family insurance coverage, with an annually calculated cap on the monthly amount that the district would be obligated to pay for the stipend and insurance benefits combined. Any difference between the cost of the insurance and the amount of the monthly stipend was to be either made up by, or refunded in cash to, the teacher. The annual cap was to be calculated based on a 50/50 split of the funds that the district saved by replacing the presumably higher-paid retiring teacher with a presumably lower-paid one. In effect, then, the district and the retiring teachers were to share equally in the savings generated by the teachers' early retirements. To that end, the district's initial draft of the proposal calculated the cap based on one-half of the difference between the retiring teacher's salary and the salary of the teacher who replaced the retiree, with annual adjustments to that cap based on changes in the salary of the replacement teacher.

The association objected to the comparison used in the initial method of calculating the cap because it did not account for the possibility that the retiree's position would be filled by an experienced teacher already on staff in the district. If that were to occur, a new teacher paid at what would likely be a much lower salary would take the place of the transferred teacher, not the retiring teacher. Comparing the retiree's salary only to that of the experienced teacher who transferred to the retiree's position, instead of to the salary of the new teacher hired after first filling positions through in-district transfers, would cause the early retirement benefit

to be small or nonexistent. That would be true even though the district still achieved a significant savings.

The district agreed with the association's concern and revised the proposal to accommodate that situation. The following language met with the approval of both parties:

> "The cap will be calculated in the following manner: The base salary of the new teacher hired to replace the retiree will be subtracted from the base salary that the retiree would have earned. If a current in-district teacher is transferred to teach the actual classes that the retiree taught, then the actual salary of the new teacher hired to fill the staff vacancy shall be the salary used to calculate the cap. The maximum cap will be one half (½) that amount."

If more than one teacher retired in the same year, the cap was to be calculated by averaging the individual caps for the retiring teachers. The parties further agreed to language giving the district the authority to discontinue benefits if "it is necessary to lay teachers off due to enrollment decreases or budget shortfalls" and to language obligating the district to continue the program throughout the duration of the agreement only as long as "it remains cost effective to the [d]istrict." Significantly, in discussing and agreeing to the voluntary retirement incentive provision, the parties did not contemplate the possibility that any of the affected positions would involve half- or part-time teaching positions. Nor did the parties foresee the possibility that, due to reassigned job responsibilities, reductions in force, or similar administrative decisions, no "new" teacher would be hired to fill either a retiree's position or that of a teacher transferred into the retiree's position.

In 1998, three district teachers, Hinkle, McDermott, and Drury, took voluntary early retirement. Hinkle was replaced by a teacher who was new to the district. McDermott's position was filled by an in-district teacher whose position, in turn, was filled by a new-to-the-district teacher. Thus, their circumstances fell within one of the two situations contemplated by the parties in the course of drafting the voluntary retirement incentive. That did not happen in Drury's case, however. Drury, who taught third grade at the elementary school, was replaced by an "in-district"

teacher, Hogue, who previously had been a full-time special education coordinator and teacher at the high school level. Contrary to what the parties contemplated in negotiating the CBA, however, no teacher new to the district was hired to replace Hogue. Rather, the district determined that 40 percent of Hogue's former special education duties (0.4 of her position's responsibilities) did not have to be performed by a certified teacher. As a result, the district reassigned those responsibilities to the principal of the high school, who evidently was able to perform them along with his other job duties. The district then combined the remaining 0.6 full-time equivalent (FTE) of Hogue's former position with a 0.4 FTE position previously held by in-district teacher Meyer. Simultaneously, Meyer was hired as a full-time teacher to fill Hogue's former, and by then reconstituted, position. The diagram below illustrates those reassignments and position changes, with the shaded portions of the position boxes representing duties that require a certified teacher.

**Before Drury's Retirement**

1.0 FTE
Drury's Position

1.0 FTE
Hogue's Position
(0.6 certified teacher tasks;
0.4 noncertified teacher tasks)

0.4 FTE
Meyer's Position

**After Drury's Retirement**

1.0 FTE
Drury's Position
(Filled by Hogue)

1.0 FTE
Hogue's Position
(Assignments changed;
filled by Meyer)

0.4 FTE
Hogue's former noncertified
tasks reassigned to school
principal

The district then calculated the monthly stipend amount for Hinkle, McDermott, and Drury by averaging the differences between their respective potential salaries—*i.e.*, the salaries they "would have earned" had they not retired—and the salaries of their replacements. Although Meyer was not "new" to the district, the district and the association agreed that she should be considered the teacher who filled the "vacancy" created by Drury's retirement. In calculating the difference between the salary that Drury would have earned if she had not retired and Meyer's salary, the district

used Meyer's full-time salary of $39,509. The resulting average monthly cap for the three retiring teachers was $331.32 per teacher.

The association objected to the district's calculation, arguing that, for the purpose of the monthly stipend calculation required by the CBA, Drury was in effect replaced by only 0.6 FTE of Meyer's position, because Meyer was "new" to only that portion of the position. The association contended that Meyer's salary therefore should be valued at $23,705, resulting in a greater difference between her salary and Drury's and, as a consequence, a larger monthly cap for the three retirees of $550.82. When the district declined to use the association's method of calculation, the association filed a complaint with ERB asserting that the district had breached the CBA and, as a result, had committed an unfair labor practice in violation of ORS 243.672(1)(g).

After hearing the matter, ERB issued an order concluding that the district had committed an unfair labor practice. ERB determined that the voluntary retirement incentive provision of the CBA did not address the particular factual situation presented. Nevertheless, adhering to what it deemed to be the unambiguous language of the CBA, ERB interpreted the CBA to require a comparison between the salary that the retiree would have earned and

"the replacement teacher's salary associated with the teacher retirement. The salary to be used is tied directly to the retiring teacher, the work performed by the retiring teacher, and the resulting vacancy. Contrary to the District's arguments, the language [of the early retirement provision] does not say or suggest that [the] 'entire' salary must be used, or that 'base' or 'actual' salary is synonymous with 1.0 FTE. Rather, the qualifying language speaks to the connection between the retirement of the teacher and the salary necessary to replace the ultimate resulting vacancy."

(Footnotes omitted.) Based on that interpretation, ERB concluded that the district had violated the CBA by calculating the retirees' benefits using Meyer's full salary rather than using 0.6 of her salary and that its action in doing so constituted an unfair labor practice under ORS 243.672(1)(g).

■ Whether ERB correctly interpreted the CBA presents us with a legal question for which our review is plenary. *See OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194-95, 808 P2d 83 (1991) (ERB, in interpreting a contract, is to apply the same legal principles that a court must apply; review of ERB's interpretation is for legal correctness). On appeal, the parties renew the arguments that they made below. In that regard, the parties agree with ERB that the pertinent language of the CBA is unambiguous. As the association characterizes the parties' positions, there "is no dispute as to the substance of how the formula is to operate. The dispute simply concerns which figures are to be plugged into that formula."

In attempting to interpret the contract to determine which "figures are to be plugged into th[e] formula" to calculate the cap, the parties' methodology is the same. Both parties engage in a detailed examination of the text and context of the provision, along with other pertinent considerations, such as extrinsic evidence of the parties' negotiations and maxims of construction. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (describing proper methodology). From that interpretive exercise, the district urges that the contract requires use of the "actual salary" of the new teacher, not a portion of her salary attributable to only part of her job responsibilities. So, according to the district, the cap on the benefit should be calculated using the difference between Meyer's full salary and the full salary that Drury would have earned had she not retired. Following essentially the same interpretive exercise, however, the association arrives at a very different conclusion. The association urges that, after Meyer filled Hogue's position, she continued to perform the job responsibilities that she previously had performed (*i.e.*, 0.4 FTE), and she therefore was a "new" teacher only insofar as she assumed the additional 0.6 FTE responsibilities of Hogue's former position. So, according to the association, because Meyer was new to only 0.6 FTE of her position, only that portion of her salary can be considered in calculating the cap.

Ordinarily, in beginning our analysis, we would provide a more detailed description of the parties' arguments

and the specific text, context, and other interpretive aids on which they rely. But we do not do so in this instance, because the exercise ultimately is unavailing, as we demonstrate below. What is clear from the terms of the pertinent provision in the CBA—as the parties concede—is that the parties expected the district and the retiring teachers to share equally in any salary savings resulting from the teachers' voluntary early retirement. The problem here arises because, as ERB found and as the parties acknowledge, the parties chose the terms that they did with the assumption that the comparison would involve only full-time teachers; they did not consider the possibility that a formerly part-time teacher might fill a retiring full-time teacher's position. The parties further anticipated the possibility that a teacher currently on staff in the district would replace the retiring teacher and that a new-to-the-district (and presumably lower-paid) teacher would ultimately replace that teacher rather than fill the position of the one who retired. Again, however, the parties did not consider the possibility that no new-to-the-district teacher would be hired.

We do not belabor the protracted interpretive routes that lead each party to its competing position because, quite simply, neither interpretation is tenable. The problem is best demonstrated by considering a straightforward hypothetical in which a full-time teacher is replaced by a part-time, in-district teacher, and a new teacher is hired on a part-time basis to replace the transferred teacher:

### Hypothetical

Full-time retiring Teacher A (in position 1) earns $40,000 a year; Teacher B earns $18,000 (half of her $36,000 full base salary) working part-time (in position 2); and new-to-the-district Teacher C is eligible to earn a full base salary of $32,000 a year. A elects to retire. B would like to work full time, and successfully applies to transfer to A's full-time position. C is hired to fill B's vacant 0.5 FTE position. The actual salary savings to the district is represented in the following calculation:

| District's Actual Salary Savings | | | |
|---|---|---|---|
| | Position 1 (1.0 FTE) | Position 2 (0.5 FTE) | Annual Salary Cost to District |
| Pre-retirement | Teacher A $40,000 | Teacher B $18,000 (0.5 of B's full base salary) | $58,000 |
| Post-retirement | Teacher B $36,000 | New Teacher C $16,000 (0.5 of C's full base salary) | $52,000 |
| *Net Savings to District* | | | $ 6,000 |

Continuing the hypothetical, the calculations below show the presumed savings to the district, based on the parties' respective positions. The district's calculation compares the new teacher's full base salary, rather than only her 0.5 FTE actual salary, to the salary of the retiring teacher, because the retiring teacher's position is full time. The association's calculation would use the new teacher's actual 0.5 FTE salary.

| District's Calculation | |
|---|---|
| Teacher A's salary | $40,000 |
| New Teacher C's full base salary | $32,000 |
| *Presumed savings* | $ 8,000 |

| Association's Calculation | |
|---|---|
| Teacher A's salary | $40,000 |
| New Teacher C's actual 0.5 FTE salary | $16,000 |
| *Presumed savings* | $24,000 |

The hypothetical demonstrates that both of the parties' calculations fail to accurately—or even closely—predict the actual savings that the district would realize in a straightforward circumstance in which a full-time teacher is replaced by a previously part-time teacher and a new part-time teacher is then hired to fill the resulting vacancy.[1] The

---

[1] Notably, the same problem occurs if the retiring teacher is in a 0.5 FTE position, the replacement teacher wants to move from a 1.0 FTE position to a 0.5 FTE position, and a new-to-the-district teacher is hired to fill the vacant full-time position. In that circumstance, if the parties were consistent in the positions that they take here, the district's calculation would use one-half of the new teacher's salary, while the association's calculation would use the new teacher's "actual" full base salary. Using the same salary figures used in the hypothetical, the actual salary savings to the district would be $5,500. The district's calculation would

district's calculation predicts that the district will save $2,000 more than it will actually save. The association's calculation, more dramatically, predicts that the district will save $24,000, when in fact the savings would be only $6,000.

We have resorted to that hypothetical because it demonstrates tangibly what would otherwise be difficult to describe. Quite simply, the terms that the parties used in drafting the voluntary retirement incentive provision accurately predict the salary savings to the district only when all of the teachers involved work on the same FTE basis—*i.e.*, they are all full-time teachers (as the parties contemplated) or they are all part-time teachers. In any other circumstance, the parties' objective requires the calculation to be described using other terms.[2]

The problem, then, is not one of interpreting the CBA as written. The problem is that the parties' written agreement lacks terms appropriate to the factual circumstance presented. *Restatement (Second) of Contracts* section 204 (1981) addresses omissions of that kind and proposes that the court supply a term that is reasonable under the circumstances:

> "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."

Such omissions may occur because "[t]he parties to an agreement may entirely fail to foresee the situation which later arises and gives rise to a dispute" or "they may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be

---

underpredict the savings ($4,000). The association's calculation would be particularly far off the mark, predicting a *loss* to the district of $12,000.

[2] We do not attempt to suggest the terms of an alternative calculation because it is not obvious to us that a single calculation would fit the various part-time/full-time combinations that are possible or likely. *See* 186 Or App at 344-45 n 1.

unpleasant or might produce delay or impasse." *Id.* at comment b. In supplying a term that is reasonable in the circumstances, a court may consider "the meaning of the words used and the probability that a particular term would have been used if the question had been raised" and it may resort to parol evidence. *Id.* at comment d.

Neither this court nor the Oregon Supreme Court has expressly endorsed section 204 of the *Restatement*. The *Restatement*'s approach, however, is identical to the one that Oregon courts have adopted in a closely analogous context—that of supplying a reasonable term to fill a contractual gap when the equitable remedy of specific performance is sought. For specific performance to be available, a court will not go beyond the agreement struck by the parties or make a new contract for them; the contract therefore must be sufficiently defined to serve as the foundation for a specific judgment. *See generally Van v. Fox*, 278 Or 439, 445-46, 564 P2d 695 (1977) (quoting *Feenaughty v. Beall*, 91 Or 654, 667, 178 P 600 (1919)); *Miller v. Ogden*, 134 Or App 589, 593, 896 P2d 596 (1995), *aff'd*, 325 Or 248, 935 P2d 1205 (1997). But assuming that the parties' bargain is sufficiently definite to be enforceable (and, significantly, neither party argues here that the CBA is not), courts should avoid " 'the destruction of contracts' " and strive instead " 'to carry into effect the reasonable intentions of the parties if that can be ascertained.' " *Van*, 278 Or at 445 (quoting authorities). The approach is pragmatic, not formalistic:

> " 'Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact.' "

*Id.* at 446 (quoting 5A *Corbin on Contracts* § 1174, 279-83 (1964)). As the Oregon Supreme Court characterized it in *Van*, "the resulting standard becomes one of substantial fairness to both parties" such that the parties are not required "to perform additional, material terms to which [they] did not either explicitly or implicitly agree," but neither are they allowed to avoid their contractual duties "merely because the language which was utilized to express the agreement is less specific and complete" than it should have been. *Id. Accord*

*Miller v. C. C. Meisel Co., Inc.*, 183 Or App 148, 155, 51 P3d 650 (2002).

█ Because it is consistent with the "courageous common sense" principle articulated in the analogous contractual disputes, and because it best serves the parties' bargain and their expectations, this is an appropriate circumstance in which to follow section 204 of the *Restatement*.[3] Here, there is no question that the parties intended their agreement to be a binding expression of their rights and duties regarding the voluntary early retirement of district teachers. Further, as ERB found and as the parties agree, the parties entirely failed to foresee the possibility that full-time teachers might be replaced by formerly part-time teachers or that no new-to-the-district teacher would be hired to fill any vacancy that ultimately resulted. Neither party argues that their omission in crafting the terms for the calculation under those circumstances should defeat their bargain, and we agree that it should not. Indeed, that understanding is implicit in the parties' mutual agreement that, although no new-to-the-district teacher was hired as a result of Drury's retirement, Meyer— whose salary was the lowest among the affected teachers— should be considered a "new" teacher for purposes of the salary comparison.

█ The remaining question, then, is: What further term is reasonable to supply under the circumstances? Here, we have no difficulty determining the parties' essential expectation. Both the CBA, as drafted, and the extrinsic evidence of

---

[3] The problem that confronts us in this case—that of a contract sufficiently definite to be enforced, but the terms of which do not address the factual circumstance presented—is particularly common in the area of collective bargaining. Unlike a commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, a collective bargaining agreement is a skeletal, interstitial document. *See generally Steelworkers v. Warrior & Gulf Co.*, 363 US 574, 578, 580-81, 80 S Ct 1347; 4 L Ed 2d 1409 (1960). A collective bargaining agreement is akin to a generalized code designed to cover a whole employment relationship and myriad circumstances that no drafter can fully anticipate. *See generally Swanson v. Van Duyn Choc. Shops*, 282 Or 491, 495-97, 579 Or 239 (1978). Arbitration serves to fill gaps in collective bargaining agreements and arbitrators permissibly may resort to sources other than legal principles (*i.e.*, the "common law of the shop" and the arbitrator's personal judgment) to supply terms that the parties have omitted from the contract. *Id.* Courts, on the other hand, are limited to general principles of contract law in performing the same gap-filling function. *Id.* at 497. For that reason, it is particularly appropriate to follow the "courageous common sense" principle and *Restatement* section 204 in the area of collective bargaining contracts.

the parties' dealings reveal that the essence of the parties' bargain was that the district and the retiring teachers would share equally in the salary savings that resulted from a teacher's voluntary early retirement. The appropriate term to supply, therefore, is one specifying that half of the amount of any salary savings that is a result of the teachers' retirement should be used in calculating the annual cap. Here, if the only unforeseen circumstance was the mix of full- and part-time positions in the chain of succession, achieving the parties' expectation would be a straightforward matter of calculating the total savings to the district and dividing that amount in half to arrive at the cap. That could be done using the kind of calculation represented in our earlier hypothetical in determining the district's actual salary savings.

But the facts here involve one additional circumstance. After Drury retired and Hogue successfully applied to take her place, the district determined that Hogue's vacant position could be reconfigured because some of Hogue's former responsibilities did not have to be performed by certified teaching staff. Those responsibilities were therefore reassigned to other staff (*i.e.*, the principal of the high school). That allowed the district to combine the remaining 0.6 FTE of Hogue's position with Meyer's existing 0.4 FTE responsibilities and then to appoint Meyer to fill that position as a full-time teacher, as she desired to do. In effect, through the reassignment of job responsibilities, the district achieved a 0.4 FTE reduction in force (RIF).

Should the savings of the RIF be split between the district and the retiring teachers? That is the crux of the issue here; the answer hinges on whether the reasonable solution under the circumstances is to split that portion of the savings between the parties. The district argues that any savings should not be so divided, pointing to the section of the CBA that provides that the district, if it has to reduce personnel due to budgetary constraints, is entitled to discontinue the early retirement benefits. The district also relies on a portion of the CBA that preserves the district's managerial discretion, subject to the express limitations set forth in the CBA, to determine the "size of the working force" and the "allocation and assignment of work to unit members." In

response, the association emphasizes that the district's prerogative to discontinue the early retirement benefits is expressly contingent on a RIF occurring because of "enrollment decreases or budget shortfalls." The association does not directly respond to the district's argument that, under other express terms of the CBA, the district's reserved managerial discretion encompasses the allocation and assignment of work to the teachers.

Although the contextual provisions that the parties point to are helpful, they serve merely to reinforce the basic expectation underlying the voluntary early retirement provision. The essence of the bargain struck by the parties was that they would divide any savings achieved *as a result of* a teacher's early retirement. Thus, if the RIF in this case were due to a "budget shortfall" or an "enrollment decrease," *a fortiori* it would not have a causal nexus to Drury's retirement. Likewise, if the district would have reassigned some of Hogue's former responsibilities for the sake of fiscal economy regardless of whether Hogue vacated the position to take Drury's place, then the RIF would not be a result of Drury's retirement. Instead, as the district urges, the downsizing of Hogue's position in such a circumstance would be "sheer coincidence" and "not the result of anyone's retirement." But if, on the other hand, the district would not have taken that action had Hogue remained in her position—or, said another way, if the decision to reassign some of Hogue's responsibilities depended on the position becoming vacant—then the RIF bears a sufficient causal connection to Drury's retirement to be deemed to be a result of it.

■ We therefore conclude that the resolution of this case turns on whether the district would have reassigned some of Hogue's former responsibilities and "downsized" the teaching force regardless of Drury's retirement and the accompanying vacancy in Hogue's position. If the answer is that Drury's retirement was instrumental in permitting the district to achieve that savings, then the savings attributable to the RIF should be included in calculating the cap. Alternatively, if the answer is that the district would have reassigned some of Hogue's duties even if she had not transferred to Drury's position, then Drury's retirement is a coincidental event, not

a causal one. In that event, the cap should be calculated excluding the savings attributable to the RIF and including only the savings that resulted from Hogue's replacement by a lower-paid teacher (*i.e.*, Meyer).[4]

ERB made no factual findings to answer that pivotal question. Assuming that the record is sufficiently developed on the point, ERB should determine in the first instance whether the association has carried its burden of proof in that regard.[5] The appropriate disposition therefore is to remand to ERB. *See* ORS 183.482(8)(a)(B) (if agency has erroneously interpreted applicable law, this court on review may remand the case to the agency for further action under a correct interpretation of the law).

Reversed and remanded.

---

[4] The parties did not formulate their proposed cap calculations with the standard that we have identified in mind. It appears that the association's proposed calculation (which includes only 0.6 of Meyer's salary) may coincide with a calculation that would give the retiring teachers the benefit of half of the savings achieved as a result of the RIF. It is less clear to us that the district's formula accurately excludes the full savings attributable to the RIF. In all events, as we describe below, the case must be remanded to ERB for further factfinding. The parties appropriately can address the proper calculation to be used as part of the proceedings on remand.

[5] Our review of the record suggests that the testimony on point is limited. The only relevant testimony that we have identified is that of Ronald Worrell, who became the superintendent of the district after the negotiations for the CBA. He explained that Hogue's former position was reconfigured to meet a reduced budget for teacher salaries. But he was not asked and did not state whether the budgetary reduction was due to revenue shortfalls or was a savings that the district chose to accomplish as a matter of its managerial discretion. Nor did he state whether the reconfiguration of Hogue's position could have and would have been accomplished even if Drury had not retired, thus causing Hogue to remain in her former position. Because the question is not before us, we express no view on whether the pertinent statutes and administrative rules would permit ERB to reopen the record for further evidentiary development.