Argued and submitted April 25, 2005, affirmed November 1, 2006, petition for review denied February 21, 2007 (342 Or 416)

Pamela DALTON,
*Respondent,*

*v.*

ROBERT JAHN CORPORATION,
an Oregon corporation,
Superior Tree Stewards, Inc.,
an Oregon corporation,
and Chester Jahn,
*Defendants,*
*and*

Opal JAHN,
*Appellant.*

Opal JAHN,
*Appellant,*

*v.*

Pamela DALTON
and Linda Chertudi,
*Respondents.*

Teresa GITOMER,
*Respondent,*

*v.*

Chester JAHN
and Robert Jahn Corporation,
*Defendants,*
*and*

Opal JAHN,
*Appellant.*

00P-1366, 99P-1560; A122167

Barbee B. Lyon argued the cause for appellant. With him on the briefs were Daniel H. Skerritt and Tonkon Torp LLP.

Jeffrey M. Batchelor argued the cause for respondent Pamela Dalton. With him on the brief were William N. Mehlhaf, Paul Bierly, and Markowitz, Herbold, Glade & Mehlhaf, P.C.

No appearance for respondent Linda Chertudi.

No appearance for respondent Teresa Gitomer.

Before Armstrong, Presiding Judge, and Landau, Judge,* and Breithaupt, Judge pro tempore.

BREITHAUPT, J. pro tempore.

Armstrong, P. J., dissenting.

---

\* Landau, J., *vice* Wollheim, J.

**BREITHAUPT, J. pro tempore**

This case arises from a dispute between members of the Jahn family, primarily over control of the Robert Jahn Corporation. Defendant Opal Jahn appeals a decree of specific performance granted by the circuit court, arguing that a settlement agreement signed by the parties is too indefinite to be enforced by that decree. Opal Jahn's daughter, Pamela Dalton, a plaintiff in this case, disagrees, claiming that the settlement agreement is sufficiently definite. We affirm.

■    Because this is an action in equity, our review is *de novo*, ORS 19.415(3); *Hughes v. Misar*, 189 Or App 258, 260, 76 P3d 111 (2003), *rev den*, 336 Or 615 (2004), although we place "great reliance" on the trial court's determinations regarding the credibility of witnesses. *Povey v. Clow*, 146 Or App 760, 765, 934 P2d 528 (1997). In 1980, Opal Jahn and her husband Robert Jahn formed a lumber company, the Robert Jahn Corporation (RJC), the corporate stock of which became owned by themselves and each of their children: Pamela Dalton, Teresa Gitomer, Linda Chertudi, and Chester Jahn.[1] In 1992, Opal and Robert transferred their RJC shares to the Jahn Living Trust. The trust held those shares until Robert's death in 1996, at which point the trust was divided into two new trusts (the Opal Jahn Marital Trust and the Jahn Family Credit Shelter Trust), each of which held approximately half of the RJC shares previously held by the Jahn Living Trust. Under the terms of the new trusts, Opal, as trustee, exercised sole control over the RJC shares held by each trust. Through the trusts, Opal controlled a bare majority of RJC's stock. Opal also became the president, secretary, and sole director of RJC.

Subsequently, a dispute began over the future of RJC's assets and business. Particularly contentious was a proposed business deal known as the "Ten Mile" transaction, in which Chester apparently proposed to mortgage land or harvest and sell timber owned by RJC in order to buy property in southern Oregon; Chester's company, Superior Tree Stewards, Inc., was allegedly involved in the deal. Pamela

---

[1] For clarity, in the remainder of this opinion we refer to all members of the Jahn family by their first names.

thought the transaction would deplete RJC's assets and sought an injunction against it. Separately, Teresa brought suit regarding her 1995 sale of her RJC shares to RJC. She claimed that the sale should be rescinded, or that it was subject to a right to repurchase, which she was prepared to exercise. Opal, Chester, and RJC were defendants in both suits; Superior Tree Stewards, Inc., was also a defendant in Pamela's suit.[2]

The trial court suggested that the parties attempt to reach a settlement and, when they agreed to do so, appointed William Richardson, a former Chief Judge and current Senior Judge of this court, to preside over the parties' settlement negotiations.[3] Richardson conducted two settlement conferences in July and August 2000, during which a proposal developed to split RJC into several corporations. Whereas Pamela's attorney, Feibleman, favored a plan that would have ended in four corporations, each to be headed by one of the Jahn children, Opal's attorney, Brink, drafted documents that would split RJC into five corporations, one of which would still be headed by Opal. The Jahn family members had questions about the tax implications of both plans, so Feibleman asked a specialist in tax and business law, Jennings, to present a reorganization plan at a third settlement conference on September 12, 2000.

All of the Jahn family members were present at that conference with their attorneys except Linda, who had no attorney, and Teresa, who participated via telephone but whose attorney was present. Richardson made it clear that anyone could enter a side room for private discussions at any time, that anyone could ask any question at any time, and that anyone could propose any settlement terms at any time. All of those options were utilized by the Jahns and their attorneys during the conference.

---

[2] Teresa did not appear in this appeal.

[3] Richardson was to be a settlement judge, not a mere mediator. The letter from the court proposing that the parties meet with Richardson specifically states that Richardson was to preside over a "settlement conference," which would lead to a "universal settlement." No mention is made of mediation in the letter, and the testimony at trial reflects that the parties contemplated settlement, not mediation.

Jennings gave a detailed presentation of a plan to use a device known as a divisive reorganization to effectively split RJC into four separate corporations: RJC and three newly formed corporations. Each corporation would be headed by one of the Jahn children and each child would control a bare majority of the stock in his or her corporation. The remainder of the stock of each of the four corporations would be in Opal's control through the two trusts, each of which would own nearly equal shares in each child's corporation. The property owned by RJC would effectively be split among the four corporations in roughly equal parts. To the degree that those parts were not equal, the four corporations would grant each other timber deeds, lot line adjustments, or cash payments to equalize the value of each corporation. Moreover, each corporation would pay Opal an equal lifetime consulting fee to cover her living expenses consistent with her then-current standard of living. Each corporation would also share equally the costs of Opal's health and long-term care needs. At Opal's death, the shares in each corporation held by the Jahn Family Credit Shelter Trust would go to the child who controlled that corporation.[4] Finally, the shares in each corporation held by the Opal Jahn Marital Trust would be subject to a redemption agreement by which each corporation would buy those shares from the trust at the time of Opal's death; the proceeds of that redemption would be distributed in accordance with Opal's estate plan, as she controlled ultimate distribution of the Opal Jahn Marital Trust.[5]

The goal of Jennings's proposal was to divide RJC's assets equally among the four corporations controlled by the Jahn children while minimizing adverse tax consequences and to ensure that Opal would be secure in her remaining

---

[4] Under the terms of the Jahn Family Credit Shelter Trust, Opal possessed a limited power of appointment. Under Jennings's proposal, if all children did not agree to the settlement, Opal would irrevocably exercise that power to guarantee that, upon Opal's death, each child would receive the shares of his or her corporation held by the trust. If all children did agree to the settlement, all parties would act to amend the trust to add Teresa as a beneficiary because she had been removed following the sale of her RJC shares in 1995.

[5] Under the terms of the Opal Jahn Marital Trust, Opal possessed a general power of appointment. Under Jennings's proposal, she would retain that power. The trial court properly ordered revocation of that power so that its exercise could not be inconsistent with the agreement reached by the parties.

years and have sole control over the disposition of some assets (sale proceeds from the redemption of shares held by the marital trust). Except for Chester, who had indicated an unwillingness to agree to any of the plans discussed by the other parties, the Jahns shared those goals. Each of the Jahns, except Chester, reacted positively to Jennings's proposal. The plan did not require Chester's agreement because the other family members constituted a majority of RJC's shareholders, Opal controlled a majority of its shares, and Chester would control RJC after the transfer of assets to the three newly formed corporations.

Following Jennings's presentation, the parties began to discuss other terms that were important to them. Despite Chester's reservations, he and his sisters proceeded to divide RJC's properties among the four corporations, with Pamela's corporation taking "the Orchard" and "the Flats," Teresa's corporation taking "Grandma's Place," Linda's corporation taking the "Boys' Place," and RJC (Chester's corporation) retaining "the Home Place."[6] Opal and her daughters (the settling parties) also agreed that Teresa would buy back her shares from RJC at the price it had paid for them in 1995, adjusted for any debts from her to RJC that RJC had forgiven. The price for the shares in each corporation held by the Opal Jahn Marital Trust, to be redeemed by the corporations on Opal's death, would be their fair market value discounted to reflect minority interest and marketability. Because Opal would continue to live in a home on the Home Place, which would continue to be owned by RJC (Chester's corporation), the settling parties, including Opal acting for RJC, agreed to credit against RJC's share of Opal's consulting fee the fair market rental value of the home, which they believed was $650 per month, the amount that Opal paid RJC for rent. Lastly, the testimony indicates that the settling parties anticipated that they would act reasonably and in good faith to effectuate the proposal.[7] They also agreed to rely on mutually agreed-upon appraisers and experts, as well as Jennings

---

[6] Each of those properties was known to the Jahns and capable of exact legal description.

[7] Although the parties might not have formally agreed to operate in good faith, the law implies in every agreement "a promise of good faith to effectuate the reasonable expectations contemplated by the agreement." *Barrett and Barrett*, 126

and the other attorneys, to complete all the necessary steps to effectuate the agreement.

After those details of the settlement proposal had been discussed, Richardson met privately with Opal and her attorney, Brink, to ensure that Opal understood the proposal and to gauge her interest in signing an agreement. Richardson and Brink thoroughly explained the terms of the proposal to Opal. Although Opal was not entirely happy with the proposal, she appeared inclined to agree to it. Richardson then asked the entire group whether they were willing to settle the lawsuits on the terms they had discussed. Although the Jahn daughters were ready to do so, Chester was not, and Opal was reticent to make a final decision. Richardson told Opal that this was the time for her to make a decision, and asked her if she would settle even if Chester would not agree to the proposal. Opal said that she would and that Chester would "just have to live with it."

To memorialize that oral agreement, Richardson went to the side room and drafted a document for the parties to sign. That document stated:

"Jahns Family

"It is agreed between the undersigned Jahns family members that the division of property rights, corporate shareholder rights and asset distribution shall be in principle as described in the diagram attached as Exhibit A which shall be part of this agreement. A majority of the family members shall be sufficient to authorize finalization of the proposed distribution, as long as the majority includes Opal Jahn.

"The agreement in principle shall be finalized in writing and shall include dismissal of pending law suits [*sic*] and mutual releases of liability for all claims."

Exhibit A consisted of a drawing and text that Feibleman had copied by hand onto paper from what Jennings had written on a whiteboard during his presentation, as well as additional notes taken by Feibleman. In sum, Exhibit A included most of the terms on which the settling

Or App 62, 67, 867 P2d 540, *aff'd*, 320 Or 372, 886 P2d 1 (1994); *see also Flynn v. Hanna*, 204 Or App 760, 774-75, 131 P3d 844 (2006) (describing duty of good faith).

parties had agreed and it looks substantially like the Appendix to this opinion.

Everyone had an opportunity to review the agreement drafted by Richardson and to propose any changes they wished or add any additional terms they felt were important, but no one did. In the end, Chester did not sign the agreement, although Opal, Linda, Pamela, and Teresa, through her attorney, Lodine, did.[8] Afterwards, the mood in the room changed substantially: everyone except Chester was relieved that they had reached an agreement. Then everyone, except Richardson and Jennings, recessed for lunch. Jennings dictated his thoughts onto a tape, describing what steps would need to be taken to effectuate the agreement, including the hiring of appraisers and experts, the drafting of necessary documents, and other matters that would need to be resolved.

When everyone returned from lunch, Jennings played the tape, and the settling parties agreed that it accurately represented the terms by which they had bound themselves. Jennings, Brink, and Feibleman reassured everyone that the agreement could be effectuated even without Chester's approval. The settling parties agreed that Jennings and Brink would hire the appraisers and draft the necessary documents and that they would be paid for those services by RJC, and not by the parties individually. That term was agreed upon because the settling parties felt that Jennings and Brink would be working for the "common good" and not for any one party in particular. In addition, it was agreed that Brink and Lodine would work together to determine the terms of Teresa's buy-back of her shares. Finally, with regard to the redemption of the shares of the four corporations held by the Opal Jahn Marital Trust, the settling parties agreed that the purchase price of the stock would have to be paid within 15 years of Opal's death.

The settling parties also discussed, but did not agree on, a total amount for Opal's consulting fee, mentioning both $3,500 per month (an amount Opal had stipulated to earlier

---

[8] Chester refused to sign the agreement both on his own behalf and on behalf of his company, Superior Tree Stewards, Inc. Opal signed the agreement both on her own behalf and on behalf of RJC.

in the litigation as her living expenses) and $4,000 per month, which they felt was fair and easily divisible by four. Although the settling parties discussed how to pay for each party's attorney fees up to that day, they did not reach an agreement on that subject. Richardson scheduled another meeting for October 3, 2000, so that the Jahns could review drafts of the documents that would effectuate the agreement and so that everyone could be updated on the progress of matters. Afterwards, the conference ended.

The next day, Feibleman e-mailed a number of attorneys, stating that "[w]e have just settled a very difficult and complex [case,] and to complete the settlement" the parties would need to hire "experts" to appraise timber and property, a task as to which he solicited suggestions for appraisers. Later that day, Feibleman and Brink met to congratulate each other on reaching a settlement. In the days that followed, Feibleman forwarded to Brink the names of several appraisers, which Brink forwarded to Jennings. As Brink wrote to Jennings on September 18, "We have quite a list now, and you and I were delegated to put our heads together on the actual selection. I am happy to call each and get a feel for our ranges of cost, timing, experience, etc." At the same time, Jennings, Brink, and the other attorneys involved with the settlement had begun work preparing the documents required by the agreement.

Despite that progress, potential obstacles to effectuation of the agreement remained. As early as September 13, Feibleman had expressed to Brink a concern that "Chester would try to get everything undone." According to Feibleman, Chester had great influence over Opal and was pressuring her to frustrate the agreement. As Feibleman testified, Brink's response was, "Don't worry, it's a done deal," and that if Opal "tried to reverse herself [Brink] might not continue as her lawyer." Similarly, in a September 14 e-mail to Brink, Feibleman again expressed his fear that "Chester is putting a full court press on Opal." Feibleman concluded, "As far as I am concerned, this case is settled and witnessed by a Senior Judge and we are just drafting the documents. That is the legal part. We owe it to our clients to keep up the efforts to support the emotional reconciliation as well." Along those lines, William Mehlhaf, who represented Pamela along with

Feibleman, wrote Brink that he was "being kept apprised of the progress of settlement discussion[s]" and that Pamela was "hopeful that a resolution consistent with last week's agreement can be obtained in the near future."[9]

As things turned out, Feibleman's fears were well-founded. On September 16, Opal called Brink to express concern about the agreement reached just days before. Brink met Opal and attempted to explain the settlement but could not do so to her satisfaction. Although Brink knew Opal was not happy, he left the meeting feeling that the settlement could still go through and proceeded with the work he had previously begun. On September 20, Brink wrote Jennings requesting a status update and asking Jennings to remind him "how some of this fits together." Brink also responded to Mehlhaf, emphasizing his understanding that "it is a *process* and, while concerns remain, no doubt on both sides, we are hopeful." (Emphasis in original.)

On September 21, Brink wrote Opal a letter explaining that, despite the work being done on the settlement, "[t]here are a number of ways this might not come together yet." Brink mentioned the ongoing discussions regarding Teresa's buy-back, noting that he had given Teresa's attorney, Lodine, "several of the components of the price, but he has not responded to me yet with a figure and the rest of the pieces of the outline will need to actually fit, which we will only learn after reading drafts of the documents. But we ought to see how far apart my documents are from the one you signed."

On October 2, Jennings finally e-mailed his draft documents to the other attorneys working on the case. Jennings wrote that he had drafted the documents "with the assumption that Chester Jahn will sign them," which was consistent with the other parties' intentions and hopes that Chester would eventually sign on to the agreement.

---

[9] On September 18, Mehlhaf wrote to Yandell, then counsel for Chester, that it was his and Pamela's "understanding that, as of last week's conference, all parties other than [Chester] had committed in writing to an arrangement." Accordingly, Mehlhaf made clear that he would pursue Pamela's claims against Chester and requested compliance with prior discovery requests.

Jennings's e-mail continued that, if Chester "refuses to sign them, we will have to make some changes, including which he will not be included in the release agreement." The draft documents that Jennings attached to his e-mail were a Settlement Agreement and Mutual Release, an Agreement for Corporate Separation, a Buy-Sell Agreement, a Consulting/ Long Term Care Agreement, and a Memorandum proposing to have RJC pay the costs of each party's attorney fees through the September 12 settlement conference (a point on which the parties still had not agreed). The terms of the September 12 settlement agreement were reflected in the documents drafted by Jennings, as were additional terms designed to effectuate the agreement. The draft Settlement Agreement and Mutual Release also contained a clause stating that it and the other agreements "set forth the entire agreement among the parties and are intended to be final and binding upon them."

On October 3, the parties met for the follow-up conference they had scheduled on September 12. That meeting did not last long because, soon after the conference began, Brink announced that Opal would not proceed with the settlement agreement. On October 9, Brink informed Jennings that the settlement was off and that he would no longer serve as Opal's attorney.

Pamela and Teresa then brought an action for specific performance of the settlement agreement. The trial court found that the agreement was enforceable and entered a decree of specific performance, charging Senior Judge Richardson with the task of ensuring that the settlement was fully effectuated. Opal now appeals that judgment and decree.

■ Opal makes several arguments as to why the September 12 settlement agreement is not enforceable. Opal's first argument entails several factors, each of which can be subsumed under the contention that no contract was formed because there was no meeting of the minds on September 12. Opal contends that she did not understand what she was signing when she signed the agreement and,

more specifically, that she did not understand that the agreement would leave her without control over the RJC properties. Opal also argues that the agreement was incomprehensible to the average person, full of "laconic symbols and abbreviations."

■ "Whether a contract existed is a question of law." *Ken Hood Construction v. Pacific Coast Construction*, 201 Or App 568, 577, 120 P3d 6 (2005), *adh'd to as modified on recons*, 203 Or App 768, 126 P3d 1254 (2006). At least as to a contract's essential terms, a valid contract exists only when there is a meeting of the minds and where all terms are either agreed upon or there is a method agreed upon by which open and disputed terms can be settled, such that nothing is left for future negotiation. *Phillips v. Johnson*, 266 Or 544, 555-56, 514 P2d 1337 (1973). "Oregon subscribes to the objective theory of contracts. In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Construction*, 201 Or App at 578 (citation omitted). "[W]hether parties enter into a contract does not depend on their uncommunicated subjective understanding; rather, it depends on whether the parties manifest assent to the same express terms." *Newton/Boldt v. Newton*, 192 Or App 386, 392, 86 P3d 49 (2004) (citation omitted). Questions regarding the intent of the parties are for the factfinder. *Bennett v. Farmers Ins. Co.*, 332 Or 138, 157, 26 P3d 785 (2001).

The trial court made extensive findings regarding the process by which the September 12 agreement was reached and subsequent negotiations were handled. We find the trial court's findings well supported by the evidence in the record and adopt them as fact on *de novo* review. Opal's argument that she did not understand what she was signing is undermined by Richardson's and Brink's testimony that they carefully described to her the terms of Jennings's proposal, as well as her own statement that Chester would have to live with the consequences of the agreement. Like the plaintiff in *Newton/Boldt*, Opal cannot argue that her statements and actions at the September 12 settlement conference, "viewed objectively, could be anything other than clear and unequivocal assent to the terms" agreed on by the rest of

the settling parties. 192 Or App at 392. As in *Newton / Boldt*, there is nothing in the record to indicate that anyone knew or should have known that Opal believed anything different from what everyone else believed; the terms of the agreement were clear and comprehensible, even if complicated, and the testimony was unanimous. Everyone at the September 12 settlement conference knew, or had access to professional assistance to determine, what the agreement meant.[10] To the degree that Opal did not understand the agreement, she never manifested that lack of understanding, but rather indicated the opposite, her knowing assent to all of the agreement's terms, through objective communications and acts.[11]

In particular, we reject Opal's argument that the settling parties never intended to be bound by the terms of the September 12 agreement. Opal bases that argument on words in the settlement agreement describing it as a mere "agreement in principle" that must be "finalized in writing." *See Engineered Data Prods., Inc. v. Art Style Printing, Inc.*, 71 F Supp 2d 1073, 1078 (D Colo 1999) (" 'As a rule, "agreements in principle" that refer to subsequent "formal agreements" are not binding.' " (quoting *Skycom Corp. v. Telstar Corp.*, 813 F2d 810, 815 (7th Cir 1987))); *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F3d 405, 410 (10th Cir 1996) (holding that a document that described itself as an "agreement in principle" was not an enforceable contract). To bolster her view of events, Opal points to statements by Brink that the agreement was a mere "letter of intent" and "broad outline" that needed to be fashioned "into more concrete documents." Opal also points to statements by Jennings that the agreement was "tentative" and

"a framework to prepare final written documents similar to a letter of intent. It left a number of issues open which needed to be resolved through future negotiations * * *.

---

[10] The dissent characterizes Exhibit A as practically "written in Klingon." 209 Or App at 152 (Armstrong, P. J., dissenting). Even if it were, the parties had available to them at the time they signed the agreement persons who could interpret all the terms and explain them to the parties, including Opal, in a comprehensible manner.

[11] Opal testified at trial that she did not let anyone know about her doubts regarding the settlement agreement until after she had signed it. According to Opal, although Brink, her own attorney, thought she was "buoyant and relieved" after she signed the agreement, "deep down in her heart" she was not.

Some of these issues would be susceptible to easy resolution once the appraisals and other calculations were completed.

"* * * * *

"[Other issues, however,] required decisions to be made on the terms and conditions that would apply."

Opal's view, however, is contradicted by significant other evidence. For instance, in addition to those statements cited by Opal, Jennings acknowledged that the parties had anticipated "negotiat[ing] in good faith to implement the terms of [the September 12 agreement]" and that "if the parties [had] proceeded in good faith, the terms of the settlement agreement were capable of implementation." In this regard it is important to note that the writing says "it is agreed" that a division shall be "in principle" as described in the diagram and that the "agreement in principle" *shall* be finalized. That language reflects a binding agreement to be effectuated according to agreed principles. Indeed, Richardson, who wrote the agreement and whose credibility the trial judge particularly commented upon, explained that it was his impression that everyone understood that, in signing the September 12 settlement agreement, the settling parties agreed to be bound by its terms. Feibleman and Lodine testified that the term "agreement in principle" was meant to indicate a hard deal, and not a mere proposal, tentative agreement, or letter of intent. As Feibleman explained, the term was meant to convey that, upon the parties' agreement, the details would be left to the experts (*i.e.*, Jennings, Brink, the other attorneys, and the required appraisers, surveyors, etc.). *See Miller v. C. C. Meisel Co., Inc.*, 183 Or App 148, 154, 51 P3d 650 (2002) (" 'Courts should be ready to give those reasonable interpretations that ordinary businessmen are willing to give, seeking the aid of experts and giving heed to all the surrounding circumstances.' " (quoting *Van v. Fox*, 278 Or 439, 445-46, 564 P2d 695 (1977))).

Similarly, Richardson, Feibleman, and Lodine all explained that the phrase "shall be finalized in writing" was not meant to signify that the signed agreement was not binding; it was meant to signify that, by itself, the agreement was not sufficient to effectuate its terms: additional documents would need to be drafted and signed. That those additional

documents needed to be finalized was not a bar to the existence of a binding contract but, rather, a term of the contract in the sense that the parties had agreed to create the documents. *See Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 571-72, 903 P2d 375 (1995), *adh'd to as modified on recons*, 138 Or App 428, 908 P2d 850 (1996) (discussing the "question of whether the parties intended an agreement to be effective immediately or only after the execution of a written agreement"); *Hughes*, 189 Or App at 265 (holding in similar circumstances that "the objective meaning of the parties' action was that the agreed terms were binding immediately"). Again, the document in question here says such steps *shall* be taken. In this regard, it is important to remember that the meeting on September 12 followed earlier meetings, discussions, correspondence, and litigation events that, in some considerable detail, addressed the problem and the various proposed solutions. The record indicates that the meeting on September 12 was not to get things "started," but to bring them to a conclusion.[12]

■■ In interpreting contract provisions, we attempt to discern the intent of the parties in light of the circumstances that existed when the agreement was reached. *Yogman v. Parrott*, 325 Or 358, 361-63, 937 P2d 1019 (1997); *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 316-17, 129 P3d 773 (2006). On the one hand, parties may intend that "the making of a survey, as well as the preparation of formal legal documents, [are] to be conditions precedent to a binding legal obligation." *Phillips*, 266 Or at 551. On the other hand, "[i]f all the material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms." *Id.* at 553-54 (quoting *Wagner v. Rainier Mfg. Co.*, 230 Or 531, 540, 371 P2d 74, 78 (1962)). Determining the parties' intentions can be difficult, and it is even more so when parties describe agreements

---

[12] The dissent suggests that the statement in the agreement regarding action by a majority, including Opal, indicates no agreement was formed. 209 Or App at 153 (Armstrong, P. J., dissenting). The record supports the conclusion that those who signed on September 12 bound themselves to finalize the deal and the reference to a majority was to make clear that approval by Chester was not needed.

using labels with definite legal meanings that do not necessarily conform to the parties' intentions. *See id.* at 552 (discussing the difficulty of interpreting agreements labeled as something other than what they are claimed to be).[13]

Here it is obvious, given the competing yet reasonable meanings that the parties attach to the phrases "agreement in principle" and "finalized in writing," that neither text nor context leads to a single unambiguous meaning for those phrases. Yet the extrinsic evidence reveals that the phrases had one unambiguous meaning to the settling parties. *Nixon v. Cascade Health Services, Inc.*, 205 Or App 232, 238, 134 P3d 1027 (2006) (stating that courts look also to extrinsic evidence of " 'the circumstances underlying the formation of the contract' " to determine whether a term is ambiguous) (quoting *Batzer*, 204 Or App at 317). That evidence shows a clear intent to be bound on September 12 to the terms of the settlement, not an agreement to agree or a mere expression of intent to work toward a future, final contract. As was the trial court, we are struck by the unanimous evidence describing the change in mood at the September 12 settlement conference: Once the agreement was signed, everyone who signed it felt a sense of accomplishment. That is not the feeling usually inspired by a nonbinding letter of intent. We also find it telling that Opal's own testimony at trial undermines her argument on appeal. She did not testify that she felt the agreement was nonbinding, but rather that, after she had signed the agreement, she realized that she "shouldn't have signed that piece of paper" because it was not what she wanted and that, therefore, she "just couldn't go through with something like that." Subsequent regrets do not destroy the obligations of prior agreements. *See Miller*, 183 Or App at 155-56 ("[T]he law does not protect parties who enter into unwise agreements that are otherwise enforceable.").

Even if we were to conclude that the phrases "agreement in principle" and "finalized in writing" are ambiguous, we would conclude, based on the extrinsic evidence, that the parties intended to bind themselves on September 12. *See*

---

[13] On the problem of determining whether contracting parties intend to bind themselves either in the presence or absence of terms such as "letter of intent" and "memorandum of understanding," it has been said, "It would be difficult to find a less predictable area of contract law." E. Allen Farnsworth, *Farnsworth on Contracts* § 3.8c (1990).

*Yogman*, 325 Or at 364 (interpreting contract in light of parties' subsequent actions at second level of analysis); *Nixon*, 205 Or App at 238-39 (describing second *Yogman* level in construing contracts). The subsequent work toward completing the required documents in this case shows that the parties felt bound. Following the September 12 conference, the parties and their attorneys went into action to effectuate the agreement, not change its terms or prepare for future rounds of negotiation. Additionally, although Jennings, the lawyer who was to do the lion's share of the work, may have believed that the agreement was not binding, it is not his intent that matters, but rather that of the parties who signed the agreement: Opal Jahn and her daughters. When Opal stated that Chester would just have to live with the terms of the settlement agreement she and her daughters had signed, it is clear that she was not referring to the specter of ongoing negotiations, but rather to the imminent finalization of the asset division provided for by that agreement.

No one said or did anything at the September 12 conference to indicate an intention not to be bound to the agreement then; no one indicated on September 12 that the terms "agreement in principle" and "finalized in writing" were added to stall formation of a binding contract—indeed Richardson, who drafted the agreement, testified to the contrary. *See Hughes*, 189 Or App at 265 (finding, in similar circumstances, that, "[i]n the absence of some communicated condition regarding the postponement of the binding effect of their mutual assent, such as a provision in the [document] or a statement by one of the parties, the objective meaning of the parties' action was that the agreed terms were binding immediately"); *Graves v. Tulleners*, 205 Or App 267, 278, 134 P3d 990 (2006) ("Release agreements are favored under the law * * *."). It is not dispositive that the agreement lacks a clause stating that it is binding or that it lacks a clause stating that it is not binding. *Miller*, 183 Or App at 154 (" 'The fact that the parties omitted certain provisions that are commonly included may indicate an intention to be bound without them[.]' " (quoting *Van*, 278 Or at 446)).[14] That the settlement was termed an "agreement in principle" was meant to

---

[14] That the agreement does not contain one of those clauses merely underscores the parties' lack of legal sophistication, despite their adequate legal representation. The Jahns are not in the business of engaging in extensive settlement negotiations. When unsophisticated parties engage in a complex legal transaction

signify that it would require further work and documents; the "finalization" described in the agreement was meant to be the completion of the work and documents necessary to implement the terms of the settlement, not some other "final" or "actual" agreement.[15] *Cf. Miller v. Ogden*, 134 Or App 589, 594-95, 896 P2d 596 (1995) (finding a contract unenforceable through specific performance where it stated that the "actual contract" would be written later). It is of special significance that the legal fees incurred during the implementation of the agreement were to be paid by RJC and, therefore, ultimately borne by all of the parties equally. That economic fact says volumes about the change from adverse litigation to mutual implementation of an agreement. We find that the agreement, although labeled an "agreement in principle" to be "finalized in writing," actually was meant by the parties to be immediately binding on all who signed it.[16] In short, there was a valid contract on September 12.[17]

---

and rely on experts to fill in the details, it is more likely that they intend to be bound by the agreements that they reach than that they intend to engage in protracted rounds of negotiation. *See Skycom Corp.*, 813 F2d at 816 (discussing the difference in parties' intent between large- and small-scale transactions). That is certainly the case here. Indeed, as Feibleman testified, his regular practice is in divorce and family law. He was unversed in business and tax law, and he himself felt the need to rely on experts such as Jennings to implement the agreement.

[15] The dissent seizes on the word "proposed" found in the settlement agreement as evidence that "the parties did not reach a binding settlement agreement on September 12." 209 Or App at 153 (Armstrong, P. J., dissenting). Neither party places much emphasis on that word, and we conclude that the word "proposed," read in context, instead indicates, like the phrases "agreement in principle" and "finalized in writing," that the parties intended to be bound to the terms on which they had agreed, leaving subordinate details to future calculation and negotiation.

[16] The dissent opines that certain terms, such as those regarding Teresa's buy-back of her shares, were "not even mentioned in Exhibit A." 209 Or App at 158 n 6 (Armstrong, P. J., dissenting). That fact does not lead to the conclusion that those terms were not intended to be a binding part of the settlement agreement. Agreements such as the one reached by the parties on September 12 need not be in writing, and the parties' oral agreement suffices to bind them as to all terms agreed upon but not put in writing. That holds true for both those terms agreed upon before the agreement was signed and those terms, including buy-back of shares by Teresa, agreed upon when the parties reconvened after lunch. According to Lodine, the agreement regarding Teresa's buy-back of her shares occurred at the initial settlement conference in July 2000, well before September 12. Had the parties not agreed that Teresa was to buy back her shares, there would have been little point in Brink and Lodine working so hard to determine the correct price for the buy-back under the agreed-upon principle of restoration of the status quo before the redemption.

[17] Even if we were to conclude that the parties had not intended to bind themselves as of September 12, we would conclude from their subsequent actions that

■■■■■ We next turn to Opal's final argument as to why we should not require specific performance of the settlement agreement. Opal contends that the agreement is too indefinite for specific performance. In determining whether to require specific performance of a contract when its definiteness is disputed, we follow the rule of *Booras v. Uyeda*, 295 Or 181, 666 P2d 791 (1983). *Genest v. John Glenn Corporation*, 298 Or 723, 744, 696 P2d 1058 (1985) (stating that *Booras* governs such claims). In *Booras*, the Supreme Court held that, "[t]o be entitled to specific performance, a contract must be definite in all material respects, with nothing left for future negotiation." 295 Or at 191. While a court may allow exceptions for "subordinate details of performance," it cannot, "under the guise of 'filling gaps' make the contract which it thinks the parties would have agreed to. The court can only enforce an existing agreement which is so definite in its terms that the court can frame a decree to compel performance." *Id.* at 192-93 (citation omitted). For instance, we have held that earnest money agreements are enforceable through specific performance only if all essential terms are resolved, even though minor details may be left to future agreement. *Lang v. Oregon-Idaho Annual Conference*, 173 Or App 389, 397, 21 P3d 1116 (2001).

■■■ ■■■ There are two crucial distinctions to bear in mind. The first is that between material terms and subordinate details of performance. "A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Johnstone v. Zimmer*, 191 Or App 26, 34, 81 P3d 92 (2003) (citation omitted). For instance, we have identified certain terms that are always material and essential to land sale contracts: "the designation of the parties, the identification of the property, the promise to sell and buy, the purchase price and how it will be paid, and a fixed time and place for the delivery of the deed or 'closing.' " *Povey*, 146 Or App at 764. Other terms may also be material to an agreement,

---

they acted "as if they had a contract," thus manifesting mutual assent to the entire agreement afterwards. *See Ken Hood Construction*, 201 Or App at 579 (holding that actions can imply acceptance of an agreement, "notwithstanding that a written contract had not been executed").

depending on the nature of the agreement and the circumstances as they existed at the time the parties reached the agreement. *Ochs v. Albin*, 137 Or App 213, 218, 903 P2d 906 (1995) (essential terms include terms required by law and those "unique to a particular agreement"). All terms that are not material are subordinate to the material terms. Whether a contractual term is material "is a question for the factfinder unless the uncontested evidence leads to only one legal conclusion." *Johnstone*, 191 Or App at 34. Because our review is *de novo*, we determine which terms were material to the parties in this case. *Povey*, 146 Or App at 765.

■ The second crucial distinction is that between definite terms and indefinite terms. A material term is definite when it is defined explicitly or "where the parties specified a canon or method by which the missing term could be supplied by the court." *Logan v. D. W. Sivers Co.*, 207 Or App 231, 238, 141 P3d 589 (2006) (citation omitted); *see also Phillips*, 266 Or at 555 (holding that a contract is enforceable where all terms are either agreed upon or where a "method is agreed upon by which such a term or provision can be settled"). For instance, the parties may be deemed to have incorporated standard provisions into their agreement. *Hughes*, 189 Or App at 266. They might also have made or allowed reference to prevailing market rates or particular methods of calculation. *See Yeon Street Partners v. Environmental Consulting*, 125 Or App 501, 504, 865 P2d 1325 (1993) (stating that, when parties agree to "reasonable" prices and "equivalent" amounts, those terms are "not so indefinite as to prevent an agreement from being enforceable"); *Boese v. Knight*, 104 Or App 559, 563, 802 P2d 675 (1990) (term was sufficiently definite where its precise meaning could be surmised readily from the language used by the parties); *Siegner v. Interstate Production Credit Assn.*, 109 Or App 417, 431, 820 P2d 20 (1991) (terms were sufficiently definite where the parties agreed to accurately and objectively calculate and represent figures in pursuit of their agreed upon goals). Additionally, in certain compelling circumstances, courts may use "courageous common sense" to imply fair and reasonable terms that give effect to the parties' intentions. *Hughes*, 189 Or App at 266 (citation omitted); *see Harrisburg Ed. Assn. v. Harrisburg Sch. Dist. #7*, 186 Or App 335, 345-46, 63 P3d

1176, *rev withdrawn*, 336 Or 15 (2003) (so doing when unforeseen circumstances arose under a binding contract). Subordinate details are sufficiently definite if any of those objective methods are utilized. They are also definite if the parties have agreed to negotiate a final resolution with regard to them; if the negotiations fail, the court can infer standard or reasonable terms that will fairly give effect to the parties' intentions. *See Hughes*, 189 Or App at 266.[18]

Here, Opal argues that several terms were indefinite. We take each term in turn. First, Opal claims that the September 12 agreement was too indefinite for specific performance because it was unclear whether the agreement was binding and whether Chester was a necessary party to it. Although the binding nature of a contract is clearly material, we have already held that the parties did, indeed, agree to bind themselves to the terms of the settlement agreement. As we stated in *Hughes*, 189 Or App at 265-66, "there are several possible ways in which a preliminary agreement may be binding despite the need for extensive subsequent documentation." *See also Ochs*, 137 Or App at 218 ("[T]he fact that the parties contemplate a future writing does not by itself prohibit specific performance."); *cf. Ogden*, 134 Or App at 594 (where parties contemplate a future, "actual" contract containing additional material terms, there can be no specific performance). Moreover, the record is clear, and on *de novo* review we find, that Chester was not a necessary party to the agreement. The testimony on that point was uncontradicted. Although Chester did not agree to the settlement on September 12, the settling parties hoped that he would eventually agree, and, therefore, the documents required to complete the settlement were first drafted so that he would have one last chance to sign them. Only if Chester

---

[18] We recently described the various categories into which preliminary agreements have been divided. *See Logan*, 207 Or App at 237-38. Our analysis and conclusions above lead us to characterize the contract at issue in this case as an "agreement with open terms." *See id.* (describing such a contract as "one in which the parties agree to be bound by some terms but leave others open for the court to fill in"); *Farnsworth on Contracts* § 3.8c ("Whether the parties have made an agreement, either preliminary or ultimate, with open terms depends on whether they intend to be bound *even if they are unable to agree on the open terms*." (emphasis in original)). So long as a court can fill in an open term through use of one of the methods mentioned in the text, the term is definite enough to be enforceable through specific performance.

remained opposed to the settlement would the documents then be redrafted so as to force the agreement into effect, which the remaining Jahn family members could accomplish, by the terms of the agreement, without Chester. We conclude that Jennings's drafting of the necessary documents so as to include Chester is not evidence that the agreement was indefinite or nonbinding on September 12, but rather that the agreement included the hope that Chester would sign, and the ability and mechanisms to enforce the agreement without him.[19]

Opal also argues that the agreement is not enforceable through specific performance because the parties failed to agree on terms material to the use of timber deeds to equalize the value of each Jahn child's corporation. Specifically, Brink testified that the parties had not decided the amount of timber that would be cut, which specific tracts would be cut, whether they would be clear-cut, or what specific lot line adjustments or cash payments, if any, would be made instead of or in addition to timber deeds. The dissent finds that argument persuasive, noting that agreement on the identification of property is necessary in the context of a land sale contract. 209 Or App at 159 (Armstrong, P. J., dissenting).

The mistake in that argument is fundamental. Terms that are material to one kind of contract are not necessarily material to another kind of contract. *Lang*, 173 Or App at 397 (stating that whether certain terms are material or subordinate "will depend on the particular circumstances of the property or the parties" (quoting *Povey*, 146 Or App at 764)). This case does not involve a mere land sale contract but a universal settlement agreement of significant scope, encompassing several issues materially important to the parties, including an end to the litigation as well as a divisive corporate reorganization, trust matters, asset split and equalization, share buy-back and redemption, attorney fees consolidation, and provision for Opal's living and health expenses. The timber deed details described by Opal and the

---

[19] As noted above, the agreement did not require Chester's approval so long as the other parties agreed, which they did.

dissent as material (or, in the words of Chester's attorney, Yandell, "substantial") were actually considered by the parties on September 12 to be minor and incidental in comparison to the overall agreement. Moreover, they were objectively treated as such by the settling parties, including Opal, on September 12. Everyone at the settlement conference had the opportunity to propose any terms they felt were material; no one mentioned clear-cutting or identification of specific trees. If Opal felt that those terms were important, she could and should have said so at the conference. In contrast, the terms that the parties did consider material, such as the joint selection of appraisers and the overall goal of equalization of values, were agreed upon and included in the agreement and Jennings's draft documents.[20] The context of those discussions, including the discussions and correspondence occurring before September 12, demonstrate the parties effectively viewed the timber properties as fungible, at least for purposes of a balancing process that would involve experts reviewing the process and results.

Additionally, the terms of the equalization mentioned by Opal were sufficiently definite for specific performance. Here, the parties agreed to work together to "finalize" the settlement agreement by equalizing the values of the four new corporations through the use of appraisers, timber deeds, and other commonly used devices such as lot line adjustments and cash payments. *See Yeon Street Partners*, 125 Or App at 504 (stating that "equivalent" is a sufficiently definite term for specific performance). In so doing, they anticipated acting reasonably and in good faith through an objective method to arrive at a result where the major agreed-upon divisions were potentially balanced with

---

[20] In *Ogden*, we recognized that "the parties' ultimate inability to agree about [certain provisions] suggests the materiality of these terms to the parties. *See Tallman* [*v. Floran*], 53 Or App [65, 70, 630 P2d 918 (1981)] (parties' actions after an initial agreement can evince materiality of terms to those parties)." 134 Or App at 594. Here, however, the parties did not raise any new issues after September 12 and, for all issues that had been raised, except payment of attorney fees incurred before September 12, there was a final agreement either on the exact terms or on an objective method for calculating and reaching those terms. The immateriality of the unresolved attorney fees issue is discussed below.

relatively minor details, such as the location of lot lines, the number of trees that could and should be cut at any location, or the use of cash payments.[21] *See Siegner*, 109 Or App at 431 (finding similar terms sufficiently definite for specific performance). In short, the details described by Opal as material and indefinite are all either incidental or definite; they do not constitute a bar to specific performance of the overall settlement agreement.

Opal also argues that certain details of the redemption agreement, by which the four corporations would purchase the shares held in them by the Opal Jahn Marital Trust on Opal's death, were material or indefinite. Although the parties had agreed that the redemption price for those shares was to be their "fair market value discounted for applicable discounts for minority interests, lack of marketability, and any other discount available," no specific price or discount value had been set. Neither had the parties established an interest rate or payment schedule, although they had agreed on a maximum 15-year payment period. Further, Jennings's draft Buy-Sell Agreement included a term the parties had not discussed: mandatory mediation and binding arbitration should the parties fail to agree on a price. Lastly, there were no protections for Opal's position as a minority shareholder, such as rules regarding the preservation of assets or limits on corporate debt and officer compensation.

As with the details of the timber deeds, we consider the terms identified by Opal to be either immaterial or

---

[21] No party questions that there is an active timber market in Oregon or that it would be relatively easy to find independent, objective appraisers who can determine the fair market value or cash equivalents of different timber deeds and lot line adjustments with different provisions. The existence of that market and those appraisers is shown by the ease with which Feibleman and Brink gathered so many names in such a short time following the September 12 conference. After all, the devices agreed upon by the parties—timber deeds, lot line adjustments, and cash payments—are just that: devices. The fundamental economic "trade" of equalization of values had already been made on September 12; the determination of exactly how to implement that trade was left to an agreed upon, objective method. Objective valuation experts could evaluate which devices best suited the parties' fundamental goal of equalization. If, as the dissent suggests, cash payments would be difficult to make due to liquidity problems, then cash payments would not be reasonable, and the independent expert would rely on the other devices mentioned. Any breach could be remedied by a court order to sell the timber or make the lot line adjustments or cash payments necessary for equalization.

sufficiently definite to allow specific performance. Regarding the redemption price, we note that "where a contract specifies that the price is to be measured by the 'fair market value' or 'reasonable value' of the services or property involved, courts have generally held that the price is sufficiently certain in order to have an enforceable obligation." *Portnoy v. Brown*, 430 Pa 401, 243 A2d 444, 447 (1968); *see also Marnon v. Vaughan Motor Co., Inc.*, 184 Or 103, 163-68, 194 P2d 992 (1948) (holding the phrase "a reasonable margin of profit" sufficiently definite so as to be enforceable). The parties in this case agreed to hire jointly selected appraisers to accurately determine the fair market value of the shares given the discounts. Accordingly, the redemption price was sufficiently definite for specific performance. Moreover, although the lack of agreement regarding payment terms such as an interest rate might be fatal to a contract smaller in scope, *see Miller*, 183 Or App at 154 (discussing when payment terms are necessary), here it is clear that those terms were merely incidental to the overall agreement. Again, we find persuasive the fact that everyone at the September 12 settlement conference had the opportunity to add any term that he or she felt was material; no one mentioned an interest rate for the redemption agreement.[22] The same is true regarding protections for Opal's minority interest. Although it might be wise to include such protections in an agreement, they are not necessary and were not considered material by the parties on September 12.[23] *Cf. Olson v. F & D Publishing Co.*,

---

[22] The parties contemplated that each corporation might choose to pay cash, in which case payment terms would be unnecessary. To the degree that any corporation chose not to pay in cash, a statutory interest rate of 9 percent per annum could be supplied, ORS 82.010, and the parties had already agreed on a maximum payment period of 15 years.

[23] Indeed, they would not have offered Opal much additional protection. As is, if the four corporations fail to pay the full redemption price as required by the agreement, Opal's remedy (which would be sought by the successor trustee of the Opal Jahn Marital Trust) will be an action for damages based on breach of contract. That is the same remedy Opal would have if she separately negotiated for specific minority interest protections. The same is true for the trust's rights as a creditor of the four corporations.

Additionally, even without specific contractual protections for Opal's position as minority shareholder in each child's corporation, she retains those protections provided by state law. *See, e.g., Zidell v. Zidell, Inc. (24128)*, 277 Or 413, 418, 560 P2d 1086 (1977) ("We have recognized that those in control of corporate affairs have fiduciary duties of good faith and fair dealing toward the minority shareholders."); *Chiles v. Robertson*, 94 Or App 604, 619, 767 P2d 903 (1989) ("Issues of

*Inc.*, 160 Or App 582, 589-90, 982 P2d 556 (1999) ("One party's ability to meet its contractual obligations or the financial consequences of its doing so is not ordinarily a material term of an employment agreement, although those issues may be material depending on the nature of the transaction and the parties' discussions."). Finally, the inclusion of the mediation and arbitration provisions in Jennings's draft document is properly viewed as a proposal to the parties that could be, but is not required to be, used to resolve disputes.

Opal next contends, and the dissent agrees, that the details of Teresa's buy-back of her shares were material and indefinite. To understand the nature of the buy-back in full, it is important to state a few facts not mentioned earlier. When Teresa sold her stock back to RJC in 1995, RJC paid her $91,000, of which it paid $20,000 down and the balance of which it was to pay over the next seven years. Subsequently, additional shares were received by Pamela, Linda, and Chester, apparently from their parents. RJC also apparently made loans to Teresa, some of which it later forgave. At the September 12 settlement conference, the parties agreed that Teresa would buy back from RJC the shares she had sold it in 1995 at a price of $91,000, adjusted for any payments RJC had already made and for any of her debts to RJC that it had forgiven; the parties did not agree, however, on an ultimate purchase price, interest rate, or payment period. Teresa was not to be given additional RJC stock to make up for the additional shares her siblings had received, but the discrepancy that that would create between the value of her corporation and the value of the other three corporations was to be

---

whether a corporate officer or controlling shareholder has fulfilled fiduciary duties have arisen in a number of circumstances and have led to the creation of various specific rules."). The irony does not escape us that the very basis of Pamela's suit against Opal, protection of minority interests, has now become a basis for Opal to attempt to undo the settlement that ended that suit.

In short, it is not a bar to specific enforcement of an agreement that parties have not contracted for perfect or even standard remedies. Parties often leave themselves with nothing but the protections provided by statute and case law. Indeed, doing so might be an integral part of a contracting party's strategy to obtain ultimate agreement in a situation where requesting additional clauses, such as for remedies, might cause negotiations to lose momentum, focus, or trust, such that the overall agreement is jeopardized.

eliminated through the general process of equalization to which the settling parties had committed themselves.[24]

As to the materiality of the price terms of Teresa's buy-back, Opal points to an e-mail that Brink wrote to the other attorneys involved in the case, stating that Teresa's attorney, Lodine, was "still working on his proposal about Teresa's buy-in, a major pre-condition here." That statement, however, is contradicted by Lodine's response that he "never thought of this part as a 'major precondition' to an overall settlement * * * [but had] always viewed it as more of a fine-tuning of something that was agreed to by all parties." According to Lodine, once Teresa obtained "documentation regarding the loans and advances made to her over the years," she could "more accurately assess what a reasonable purchase price should be," thus expediting "a resolution of this piece of the puzzle." Moreover, none of the other settling parties considered the exact amount or the payment terms of Teresa's buy-back material; what was material—the formula for calculating Teresa's purchase price—had been agreed on. The remedy for any failure on Teresa's part to pay the ultimate buy-back price would be an order requiring her to pay that price. We again decline Opal's invitation to view details that were considered incidental on September 12, when the agreement was reached, as material terms, especially when the formula for calculation of the detail was agreed upon.

As to the definiteness of the terms of Teresa's buy-back, we find that, although the exact amount of forgiven debt might have been subject to some dispute, a reasonable figure could be reached through objective calculations based on accurate information. *Cf. Adair Homes, Inc. v. Jarrell*, 59 Or App 80, 84-85, 650 P2d 180 (1982) ("Although the parties might eventually have disagreed as to those costs, the correct figure was, nevertheless, a question of fact, rather than a term to be decided by negotiation, and plaintiff had the usual obligation of good faith, which required it to compute that figure accurately."); *Siegner*, 109 Or App at 431 (terms were sufficiently definite where the parties agreed to accurately and objectively calculate and represent figures in pursuit of their

---

[24] As Lodine testified, "it was a small fractional difference in ownership, so that did not appear to be of concern to anybody."

agreed-upon goals). To the degree that the parties had not decided on particular payment terms, those terms could be reasonably supplied, if they proved necessary at all. The parties contemplated that Teresa might pay the full purchase price up front or that her corporation might grant the other corporations timber deeds, lot line adjustments, or partial cash payments to equalize the value of all four corporations. Alternatively, if Teresa instead adopted a payment plan, the parties felt that a reasonable interest rate and payment schedule could be determined.[25]

Opal next turns to the details regarding her lifetime consulting fee. She argues that the amount was unsettled and that there was no guarantee that it would actually be paid in a timely manner. That argument fails for the same reasons that the above arguments do. The amount of the monthly consulting fee was not settled, but the parties had discussed and agreed upon the standard that payments were to be sufficient to maintain her lifestyle and cover her health-care costs. In addition, the parties had discussed an initial level of payment at one of two amounts. The first amount, $3,500, was an amount Opal had earlier stipulated to as sufficient to support her standard of living, which was the settling parties' stated goal in providing for a consulting fee. As Feibleman testified, that amount was based on Opal's "normal monthly income from the corporation" and "a historical record of what she had been spending and what her expenses had been"—indeed, it was "more than actually what she even spends." The second amount discussed was $4,000, which the parties felt was fair and easily divisible among the four children's corporations. The gap between the two numbers is not so large as to preclude reasonable agreement, and the failure to decide between them was certainly not seen by the parties as material on September 12. Indeed, Jennings's draft Consulting Fee/Long Term Care Agreement set the amount at

---

[25] Interest rates ranging from 7 percent to 12 percent were proposed by various parties. However, it appears that Chester and his attorney, Yandell, were the cause of much of the delay and difficulty regarding Teresa's buy-back in that they withheld the necessary documentation and apparently sought the 12 percent rate. Nonetheless, as Yandell admitted, absent agreement on an interest rate, the statutory rate of 9 percent would have applied. ORS 82.010.

$4,000, which comports with what the settling parties indicated was the more likely figure.[26] As with the provisions for protection of minority interest that Opal felt were material to the redemption agreement, no protection provisions were necessary or material to the lifetime consulting agreement; any breach could be remedied through a court order requiring adherence to the terms of the agreement. More importantly, the parties had agreed on a method or formula that was reasonably objective and yet could change with circumstances. Our decisions recognize such principle-based or formulaic solutions (such as those based on fair market values to be determined) as specifically enforceable. *Marnon*, 184 Or at 163-68 (concluding that a "reasonable margin of profit" is sufficiently definite); *Phillips*, 266 Or at 555 (concluding that a contract is enforceable when method for settling terms is agreed upon). It is also the case that, in other areas of the law, standards such as health, support, and maintenance are recognized as reasonably ascertainable. ORS 130.010, relating to trust administration, refers to section 2041 of the Internal Revenue Code, which, with its interpretive regulations, recognizes that a power to invade trust income or corpus for health, support, or maintenance is reasonably measurable. *Cf.* Treas Reg § 20.2041-1(c)(2). That authority is particularly relevant here as the government that regards such standards as ascertainable has every interest in not allowing undefined and unlimited powers of invasion. Lastly,

---

[26] The dissent characterizes our holding as lacking concern for Opal's "health and comfort." 209 Or App at 156 n 4 (Armstrong, P. J., dissenting). The dissent forgets two important points. First, the agreement set out a standard that could change over time. Opal would have been ill-served by a fixed amount—which appears to have talismanic significance for the dissent—if inflation ate into the buying power of the fixed amount. Second, the dissent seems to start from the premise that Opal was entitled to some payment. Prior to this agreement, however, Opal had no such entitlement. She was a majority shareholder whose stewardship of corporate affairs was being challenged by minority shareholders. Her management, including corporate payments to her that were allegedly for services, was a focus of that dispute and request for injunctive relief. Only a prior agreement of the parties, found in a stipulated temporary restraining order, permitted a continuation of such payments. Opal's choice to agree to division of corporations while putting beyond attack her right to support was hers to make; we are not at liberty to set that decision aside without legal grounds for doing so. Opal's subsequent regret of her prior agreement is not such a ground.

although the draft Consulting Fee/Long Term Care Agreement left a blank space for the amount of rent Opal was to pay Chester or his corporation for living in the house on the Home Place, the record indicates that the only number that the parties had discussed was $650 per month, the amount that Opal already paid RJC as rent for the house and that the parties felt was its fair market value.

Opal also contends that the settlement agreement is unenforceable because the details of the divisive reorganization, including the means by which tax liability would be minimized, were unsettled. It is clear from the record, however, that the parties intended to leave those matters to Brink, Jennings, and others expert in the fields of tax and business law.[27] Moreover, the lack of any specific provision regarding tax implications does not render the settlement agreement indefinite. *See Miller*, 183 Or App at 153-56 (so holding); *Olson*, 160 Or App at 593-94 (same). To the degree that any negative tax implications might arise, it appears that they would affect all the parties; that was a risk the parties apparently took into account on September 12 when they signed the agreement.[28]

---

[27] Thus, Jennings's draft Settlement Agreement and Mutual Release included clauses binding the parties, in the interest of minimizing adverse tax consequences, to operate their corporations as timber enterprises and not to sell substantial corporate interests for two years. Similarly, Jennings repeatedly stressed that he felt that the only way to be certain of the tax implications of a divisive reorganization was to first obtain a favorable private letter ruling from the Internal Revenue Service. Those are the exact kinds of complicated tax matters regarding which the Jahns turned to Jennings for expertise.

[28] We also consider unconvincing the argument that the settlement agreement is unenforceable because the parties never agreed on who was to pay the attorney fees generated by each of the parties prior to September 12. It is true that, although the parties had discussed those fees and Jennings had proposed having RJC pay those fees (RJC was already paying the fees generated after September 12, per the agreement), no consensus had been reached. Yet none of the settling parties felt that those details were material to the overall agreement when they signed it on September 12. *Cf. Povey*, 146 Or App at 764-65 (finding that, although the parties had discussed certain terms on which they did not ultimately agree, the evidence did not show that those terms "were considered—much less considered to be material—at the time defendant agreed to sell the property. Rather, the evidence shows that those issues arose and became 'material' to defendant's willingness to proceed with the sale at a later time."); *id.* at 766 (holding that a term is not material merely because, after the agreement was reached, the parties were unable to resolve their differences regarding it).

In sum, we find that the settling parties committed themselves to a binding agreement on September 12, that their minds met, and that their agreement was not lacking in material terms or methods or so indefinite so as to be unenforceable through specific performance. The dissent believes our decision enables a judge to determine material terms for the parties, without the meaningful participation of those parties. That is not so. Here, on several important points, the parties recognized that agreement on methods was important, and they reached such agreement. Values would be equalized. Payments would be at the fair market value for redemption of stock. Payments to Opal would be those needed for her support and maintenance. Teresa and the family corporation would be put into the *status quo ante*. Every day parties in Oregon negotiate such agreements, recognizing that if they have agreed on a process and if they disagree about the outcome, they can test the application of the process in litigation. That does not mean that the court in that adjudication has made their agreement. The court has only enforced the agreement. Here, reasonably objective methods, capable of application with the use of historical or present facts (market values for property, support needs for Opal, amounts of debt forgiven, or prior payments made to Teresa) were agreed upon. The parties can now go to the tasks called for by their agreement and, if necessary, apply to the court for enforcement—not creation.

We finally note the fact that when the parties were working on finalizing the agreement after September 12, no one proposed any modifications to the basic structure of the agreement or the fundamental economic terms or methods to which they had bound themselves. Instead, pursuant to an agreement to share legal costs by way of payment by RJC, they began working to effectuate the agreement, and continued to do so, until Opal unilaterally withdrew. *See Hughes*, 189 Or App at 266-67 (describing a similar situation as implying that a prior agreement was binding). The trial court did not err in entering a decree of specific performance in this case.

Affirmed.

**ARMSTRONG, P. J.**, dissenting.

The trial court judgment and order that the majority affirms is not so much one for specific performance as it is one for specific drafting. As I explain below, the writing that emerged from the September 12 settlement conference did not constitute a binding agreement and, even if it did, it was not specifically enforceable.

The writing that Opal Jahn signed consisted of two pages. The first consisted of this text:

> "It is agreed between the undersigned Jahns family members that the division of property rights, corporate shareholder rights and asset distribution shall be in principle as described in the diagram attached as Exhibit A which shall be part of this agreement. A majority of the family members shall be sufficient to authorize finalization of the proposed distribution, as long as the majority includes Opal Jahn.
>
> "The *agreement in principle* shall be finalized in writing and shall include dismissal of pending law suits [*sic*] and mutual releases of liability for all claims."

The second page, styled as "Exhibit A," consisted of a pie chart of sorts with figures and abbreviations galore and, from the standpoint of someone not familiar with this controversy, may as well have been written in Klingon.[1] That is, the document is *riddled with patent ambiguity.*[2]

The text on the first page of the writing at issue refers to itself as an "agreement in principle" and that the property distribution "shall be in principle as described in the diagram attached as Exhibit A." Furthermore, the document states that the "agreement in principle shall be finalized in

---

[1] Exhibit A looks substantially like the graphic appended to this opinion, except that the original exhibit was handwritten.

[2] As an aside, the majority uses the ambiguity in the text of the document to justify its resort to extrinsic evidence to address whether the parties had reached a binding agreement, citing *Yogman v. Parrott*, 325 Or 358, 363, 937 P2d 1019 (1997). However, *Yogman* does not prescribe the applicable analysis on a question of contract formation. *Yogman* involves the exception in the statute that codifies the parol evidence rule that allows extrinsic evidence to explain an ambiguity. However, no ambiguity is necessary to resort to extrinsic evidence on the question of contract formation. ORS 41.740 expressly provides that there is no prohibition against parol evidence "where the validity of the agreement is the fact in dispute."

writing," and that "a majority of the family members shall be sufficient to authorize finalization of the proposed distribution, as long as the majority includes Opal Jahn."

Without considering Opal's other arguments as to why no binding agreement resulted from the September 12 settlement conference, on the basis of the excerpted text alone I would conclude that the parties did not reach a binding settlement agreement on September 12. Most convincing is the statement that "a majority of family members shall be sufficient to authorize *finalization* of the *proposed* distribution, as long as the majority includes Opal Jahn." (Emphasis added.) That statement acknowledges that the distribution encrypted in Exhibit A is a "proposed" distribution that will require "finalization." Furthermore, it would have taken a majority of family members that included Opal Jahn to vote in favor of the finalization. Consequently, the writing contemplated future opportunities for the parties to express their approval or disapproval of the terms of the settlement, a contemplation wholly inconsistent with the notion that the writing was a binding agreement.

Furthermore, the September 12 writing left open too many details to permit an inference that it was a final, binding settlement. In *Wagner v. Rainier Mfg. Co.*, 230 Or 531, 540, 371 P2d 74 (1962), the Supreme Court explained that

> "[n]ormally the fact that parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled. * * * Said fact does not conclusively establish such intention. * * * If all the material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms."

(Quoting *Rosenfield v. United States Trust Co.*, 290 Mass 210, 216, 195 NE 323, 122 ALR 1210 (1935) (internal quotation marks omitted); ellipses in *Wagner*.) As I explain below in relation to the unenforceability of any agreement that was reached, the parties had not agreed on all of the material

terms when they signed the purported settlement agreement. Hence, the "strong inference" that parties contemplating the execution of a final written agreement do not intend to be bound by earlier negotiations or agreements should prevail, and we should conclude that no binding agreement was reached.[3]

But even assuming that the document signed by the parties on September 12 did constitute a binding agreement, specific performance is not available to plaintiffs as a remedy. In *Genest v. John Glenn Corporation*, 298 Or 723, 744, 696 P2d 1058 (1985), the Supreme Court noted the seminal cases on this point:

> "[W]ith respect to specific performance in equity, *Smith v. Vehrs*, [194 Or 492, 242 P2d 586 (1952)], may be said to mark the conservative end of the spectrum of our cases while *Southworth v. Oliver*, [284 Or 361, 587 P2d 994 (1978)], marks the other end. We believe it is fair to say that our decision in *Booras v. Uyeda*, [295 Or 181, 666 P2d 791 (1983)], lies between those extremities [*sic*] and that our statement there should govern courts of equity in the future in determining whether judgment of specific performance should be given."

---

[3] I also think that it is significant that the two people assigned the task to develop the documents by which the settlement was to be achieved, Jennings and Brink, did not believe that the parties had reached a binding agreement that left only drafting details to work out. Jennings's view on that issue is particularly noteworthy because he is the expert who was hired to develop the ideas that formed the basis for agreement embodied in the September 12 documents.

The majority finds it significant that the parties had agreed that the costs incurred by Jennings and Brink to develop the final documents would be borne by the Robert Jahn Corporation (RJC). That is an unremarkable fact. It is not uncommon for one party in a transaction to pay the cost of preparing the documents by which a transaction will close or a dispute be settled even when the parties still must negotiate to reach a final, binding agreement. That arrangement is particularly unremarkable, here, where Opal effectively controlled the family assets, including RJC, that would be divided to settle the family disputes.

Finally, the majority considers it significant that all family members except Chester were greatly relieved by reaching the agreement that they had reached on September 12. I have no doubt that the parties considered the agreement that they reached on September 12 to be a significant achievement in the effort to resolve an emotional and difficult intrafamily dispute. It was a significant achievement, one that finally identified a path by which the parties could resolve their dispute. The desire by some family members to hold on to that achievement is understandable. Nevertheless, the majority errs in turning the achievement into something that it was not: a binding settlement agreement.

In *Smith*, marking the conservative end of the spectrum, the court stated that "[i]t is a well-established rule of law in this state that equity will not decree specific performance unless the contract is definite, certain and complete. The court cannot make a contract for the parties, nor can it make clear that which is left in doubt and uncertainty." 194 Or at 499. The court further stated that "all the terms which the parties have adopted, as portions of their contract, must be finally and definitely settled, and none must be left to be determined by future negotiations." *Id.* at 500 (internal quotation marks omitted). In contrast, in *Southworth*, which marks the other end of the spectrum of enforceability, the court held that the security provisions in a land sale contract were "subordinate details" and that the gap could be filled by prescribing "a printed land sale contract on installment payments, with standard form security provisions." 284 Or at 380.

The principle embodied in *Booras*, which the Supreme Court embraced in *Genest* as a happy medium, is this: To be subject to specific performance, a contract must be definite and certain in all material respects, with nothing left for future negotiation "except subordinate details of performance." *Genest*, 298 Or at 743 (internal quotation marks omitted). The majority acknowledges that details remained to be resolved, but maintains that those details were subordinate and that the trial court could fill the gaps in the purported agreement, presumably by using "courageous common sense." *See, e.g., Miller v. Ogden*, 134 Or App 589, 593, 896 P2d 596 (1995), *aff'd*, 325 Or 248, 935 P2d 1205 (1997) ("Oregon courts, while acknowledging the dictates of courageous common sense in permitting specific performance, have nevertheless been reluctant to engage in substantive 'gap-filling.'" (Citation and internal quotation marks omitted.)). I maintain that those details were material, and not subordinate. The question is how to distinguish between the two.

In *Lang v. Oregon-Idaho Annual Conference*, 173 Or App 389, 397, 21 P3d 1116 (2001), we explained that the answer to that question "depends on the 'particular circumstances of the property or the parties.'" (Quoting *Povey v. Clow*, 146 Or App 760, 764, 934 P2d 528 (1997).) And, as the

majority correctly notes, "A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Johnstone v. Zimmer*, 191 Or App 26, 34, 81 P3d 92 (2003).

Under that test, at least three of the terms missing from the contract were material and, hence, not subject to gap-filling by the court. First, and most critically, the purported settlement is unenforceable because the parties had not agreed on the amount of Opal's consulting fee and the details of how her long-term care needs would be met.[4] Although the figures $3,500 and $4,000 were tossed around *after* the parties signed the purported settlement agreement, the consulting fee was not agreed upon on September 12. Even the majority acknowledges that. Nonetheless, the majority reasons that it is immaterial and that the court can set it.

However, applying the principles embodied in *Johnstone* and *Lang*, it should be clear that the consulting fee was a material term, and its indefiniteness is an insurmountable obstacle to the specific enforcement of the purported settlement agreement. The substance of the purported settlement was the *inter vivos* distribution of Opal's estate.[5] After the proposed distribution, Opal would be left with no source of income, so the proposed settlement would have required each of her children to contribute toward paying her a consulting fee for the remainder of her life. In essence, she would surrender control over a very valuable timber estate in exchange for a fixed monthly stipend. Furthermore, the purported settlement provided that the consulting fee would increase based on Opal's health needs and that each child's corporation would pay for a quarter of her long-term care. However, the details of how that was to occur had not been resolved.

---

[4] It seems to me that a court should use extra caution when the gap that it is filling determines the comfort of a human being in the twilight of her life. This is not just a situation where real property or a unique good is being exchanged for money; this contract will have a real effect on the health and comfort of Opal Jahn.

[5] As Opal's attorney described Opal's perception of the purpose of the agreement, her daughters "had written her will for her."

Price is unquestionably a material term, and the agreement does not specify the price that Opal will receive in consulting fees and long-term care for the property that she will convey. Under limited circumstances, a court can enforce an agreement that does not specify the price for a conveyance if the agreement specifies a mechanism by which the price can be determined or there is an objective means by which to determine it, such as a market. *See, e.g., Building Structures, Inc. v. Young,* 131 Or App 88, 96-97, 883 P2d 1308 (1994), *aff'd,* 328 Or 100, 968 P2d 1287 (1998). Nothing of that kind is present here. The consulting fee was intended to provide Opal with an adequate income on which to live for the balance of her life. There is no market or other objective basis on which to determine that fee.

The trial court concluded that the amount that Opal would receive for her consulting fee would "be an amount that will support her reasonable and necessary monthly needs, to enable her to continue to live in a manner to which she has become accustomed." According to the trial court, that standard "provides a reasonable and objective basis upon which to calculate the monthly consulting fee." The majority agrees with that conclusion, but I cannot. The amount that would meet that standard necessarily will fall within a range. The choice of a fee that the court ultimately will make within that range is just that, a choice. There is no objective standard on which to make that choice.

Similarly, there is no market or other basis on which to determine the amount to be paid for Opal's long-term care if her health were to deteriorate. The cost of that care can vary widely depending on the nature and quality of the facility providing the care. The terms that the court must supply to determine the amount that the children will pay for Opal's long-term care will determine the quality of life that Opal enjoys at the end of her life. A court cannot make that decision for the parties, yet that is precisely what the majority says that the trial court can do here.

It is a remarkable proposition to me that the quality of life and long-term care that Opal enjoys can be treated, as the majority treats it, as a gap that can be filled by the court. It is a chasm in my view, the content of which, from Opal's

perspective, was central to the agreement. The judgment that the trial court entered, and that the majority affirms, appoints Senior Judge Richardson as a referee under ORCP 65 and directs him to prepare "an appropriate * * * long-term care agreement for Opal Jahn." I cannot conceive how that agreement can be anything other than one in which *the court* will determine *for the parties* how much the children will pay for Opal's long-term care and, hence, the quality of long-term care that Opal will receive. There simply is no objective standard by which the court can determine that. The agreement that Judge Richardson ultimately fashions for the parties might set a reasonable standard for Opal's care, but it is beyond the power of a court to supply a material term for the parties' agreement, and the amount paid to Opal for her long-term care is such a term.

Second, at the time the parties signed the purported settlement agreement, they had not agreed on the amount that Teresa would have to pay to buy back her interest in the Robert Jahn Corporation.[6] Even assuming that the parties had agreed on a formula for calculating the buy-back price (a formula that is not noted anywhere in the document signed on September 12), the parties had not agreed on the values to assign to the variables in that equation. The buy-back amount was to include amounts representing loans to Teresa from her parents and the family corporation that had been forgiven. On September 12, the parties had not agreed on that figure, and the record establishes that there could be some dispute between Teresa and Opal as to the appropriate figure. Hence, that term was subject to further negotiations after the signing of the purported settlement on September 12.

The buy-back amount was a material term because it goes to the subject of the contract and its breach would defeat the parties' purpose in entering the agreement. *See Johnstone*, 191 Or App at 34. The primary purpose of the purported settlement agreement was to resolve Teresa's lawsuit

---

[6] In fact, Teresa's buy-back is not even mentioned in Exhibit A. Although the exhibit states that Opal is to amend the Credit Shelter Trust to add Teresa as a beneficiary, it does not provide that Teresa is to buy back her interest in the family corporation, or say how the buy-back amount is to be calculated.

that sought to force the family corporation to allow her to repurchase her shares. The purported settlement agreement would allow Teresa to do so, but only if she paid back a number of loans that had been forgiven. If Teresa were to breach the agreement by failing to pay back all of the forgiven loans, the purpose of the contract would be frustrated. In effect, the parties had not yet agreed on the consideration that Teresa would provide in exchange for her reinstatement as a stockholder. It is hard to imagine a more material term to this contract. Thus, despite the majority's attempt to minimize its consequence, the buy-back amount was a material term of the contract and, without it being agreed on, the purported settlement agreement is unenforceable.

Similarly, the failure of the parties to more definitely articulate the manner in which the value of their respective portions of the estate would be equalized is fatal to the enforcement of the purported settlement agreement. It is apparent from the record, and from Exhibit A to the purported settlement agreement, that the parties contemplated that equalization could be achieved using timber deeds, lot line adjustments, and cash in a "reasonable" manner. On careful scrutiny it becomes clear that those equalization methods are not particularly "definite." Timber deeds and lot line adjustments both involve real property, and the failure to identify the specific tracts of timber or lot lines to be adjusted renders the equalization terms indefinite. *Cf. Povey*, 146 Or App at 764 (holding that the "identification of the property" is always a material and essential term in a land sale contract). To the extent that the parties contemplated equalizing their estate values with cash, it is not clear that any of the parties was liquid enough to do so, because the corporate assets consisted primarily of real property, timber, and equipment. Thus, the methods by which the children's shares were to be equalized were not definite and certain at the time the parties signed the purported settlement agreement.

The equalization terms were material because they went to the heart of the purpose of the contract. The children sought an equal distribution of the family's assets. Each child received a particular parcel of real property, but the various properties were not of equal value. Hence, the children would

have to equalize their allotments through the timber deeds, lot line adjustments, and cash in order to achieve their goal of an equal distribution. Furthermore, if one of the children were to breach her agreement to adjust her lot lines for equalization purposes (or to grant a timber deed or pay cash for that matter), then the children would not have equal shares and the purpose of the purported settlement would be defeated. Thus, the equalization methods were material terms of the contract, and their indefiniteness renders the purported settlement unenforceable.

As Opal notes, to effectuate the purported settlement agreement, the court will have to order the parties to draft multiple legal documents. The gaps that the court is filling here are too large, even for courageous common sense. If ordering the parties to use form contracts for the sale of real property marks the outer limits of the court's gap-filling abilities, as the Supreme Court suggested that it did in *Genest*, then the order issued in this case is far beyond those abilities. For the foregoing reasons, I respectfully dissent.

# Appendix

EXHIBIT A to Jahn Family Settlement

Opal through Credit Shelter Trust owns [about] 24.448% of each unit/corporation. Then each CST Section to that child at death (i.e. CST) Amend CST to add Teresa and disclaim Power of Appointment.

Opal, through marital (living) Trust owns 24.096% of each unit/corporation subject to redemption agreement.

1. Adjust values of 4 shares to equalize w/timber deeds.
2. Lifetime consulting fee to Opal from each corp increase if health needs each corp pays ¼ of long term care.
3. At death, Redemption Agreement to buy back OMT shares.