Argued and submitted January 31, affirmed June 22, 2011

STATE OF OREGON,
acting by and through its
Department of Education,
*Plaintiff-Appellant,*

*v.*

VANTAGE TECHNOLOGIES
KNOWLEDGE ASSESSMENT, LLC,
dba Vantage Learning,
a Delaware limited liability company,
*Defendant-Respondent.*

Marion County Circuit Court
07C12927; A141945

261 P3d 17

Denise G. Fjordbeck, Attorney-in-Charge, Civil/Administrative Appeals, argued the cause for appellant. With her on the briefs were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Peter J. Deeb argued the cause for respondent. With him on the brief were Craig G. Russillo, Sara Kobak, and Schwabe, Williamson & Wyatt P.C., and Deeb, Petrakis, Blum & Murphy, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

This action arose out of a contract between the State of Oregon, acting through the Department of Education (DOE or the state), and defendant Vantage Technologies Knowledge Assessment, LLC (Vantage), for the provision and administration of software for standardized testing of K-12 students in Oregon schools through the Oregon Technology Enhanced Student Assessment (TESA) system. After the contractual relationship soured, Vantage gave notice of termination of the contract, and DOE sued for breach of contract. Vantage brought counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing. A jury found that Vantage did not breach its contractual duty to DOE, and DOE does not challenge that part of the judgment. The jury also found in favor of Vantage on its counterclaims, and DOE appeals, assigning error to several rulings of the trial court, all of which stem from the trial court's determination that the parties' contract was ambiguous as to the material issue in dispute and that its meaning should be submitted to the jury. We conclude that the trial court did not err in submitting the question to the jury and affirm.

The factual background leading up to this litigation is largely undisputed. In March 2001, DOE entered into a contract with Vantage under which Vantage agreed to provide assessment software used to administer standardized testing to students in Oregon schools, to score the tests, and to provide reports regarding the test scores. The testing was necessary to allow Oregon to comply with the requirements of the federal No Child Left Behind Act of 2001, as well as with state statutory requirements for periodic student assessment. ORS 329.075; ORS 329.085.

The initial contract, executed March 6, 2001, provided that Vantage's software would support 540,292 individual tests per school year, with up to 1,000 concurrent test takers—*i.e.*, the number of students who could use the system simultaneously—when fully implemented. Section 11, paragraph 11.2, of the contract provided:

> "Should DOE deliver more than 110% (594,321) of the base volume tests in any contract year (July 1 through June 30)

DOE will enter into good faith negotiations with Vantage to establish a new pricing structure."

The contract provided that, in the first phase of the contract, Vantage would support at least 1,000 concurrent users. In the second phase, Vantage would support 3,000 concurrent users. By Phase III, the 2002-03 school year, the system would support 5,000 concurrent users.

The contract had a "not-to-exceed" clause that limited DOE's liability for the initial five years of the contract:

"Unless this contract is otherwise amended in writing by the parties, the DOE shall not be obligated under this contract to pay more than Three Million One Hundred Seventy Nine Thousand, Six Hundred Dollars (US $3,179,600) in the aggregate for the Services under this Agreement, unless otherwise amended under the terms of Section 11."

The contract expressly provided that DOE would pay for services only as provided in the contract:

"Vantage is not obligated to perform any services, and DOE has not contracted for and will have no obligation to pay for any services, except as set forth in this agreement."

The contract contained an integration clause stating that it "constitutes the entire Agreement between the Parties."

Exhibit B of the contract was entitled "TESA WORK PRODUCTS AND CONTRACT DELIVERABLES," and set out in chart form the project activities deliverable for the first three phases of the contract, as well as the payment schedule for each activity. Exhibit B included this paragraph:

"Total costs each year may not exceed:

| | |
|---|---|
| "Phase I, (January 19, 2001 through June 30, 2001) | $ 617,400 |
| "Phase II, (July 1, 2001 through June 30, 2002) | $ 509,200 |
| "Phase III, (July 1, 2002 through June 30 2003) | $ 513,000 |
| "(July 1, 2003 through June 30, 2004) | $ 770,000 |
| "(July 1, 2004 through June 30, 2005) | $ 770,000" |

The contract was amended almost every year to accommodate the parties' changing needs and requirements. The amendments resulted in additional activities deliverable and in additional costs and revisions to Exhibit B. The amendment that is central to this dispute is Amendment A5,

dated May 29, 2004. Amendment A5 states in its second paragraph that "[t]he Contract is hereby amended as follows (new language is indicated by underlining and deleted language is indicated by brackets): SEE ATTACHED." Paragraph 4 of Amendment A5 states, "Except as expressly amended above, all other terms and conditions of original contract are still in force and effect."

The AMENDMENT CONTINUATION PAGE described the amendments to the contract and included the following provisions:

"b.   The following changes deal with Phase V July 1, 2004 through June 30, 2005

"Phase V Financial Impact explanation:

"Phase V (July 1, 2004 through June 30, 2005) currently is for $770,000. This change increases the Phase V amount by $381,000 to a total of $1,151,000

"EXHIBIT B Page 4:

"The parties hereby agree that the total amount of the Phase V will be increased by $381,000 in accordance with the additional deliverables:

"1.   *The limit of 500,000 tests is removed from the contract now there is no limit.*

"2.   Increasing from 5,000 to 10,000 concurrent users upon third party certification 9/1/04 $160,000

"3.

"4.   Sample tests on an additional server using the existing application $15,000

"5.   Display a block of reading items $54,000

"6.   Other modifications $52,000

"Phase V (July 1, 2004 through June 30, 2005) operations will not exceed the $770,000 as described in the original contract.

"The payment and deliverable schedule is set forth below:

"a.   TESA program and system set up and tuning:   9/1/04   $77,000

"b.  Live  operations  of  1000  students 9/15/04   $30,000

"c.  Weekly  status  meetings  with  DOE project  director  10  monthly  billings  totaling $130,000

"d.  Monthly Status Reports (by 5th working  day)  10  monthly  billings  totaling $140,000

"e.  Weekly  Results  Data  Feeds  to  ODE 10 monthly billings totaling $316,000

"f.  Phase  5  acceptance  agreed  by  DOE 6/30/05 $77,000

"c.  Total costs each year under this agreement may not exceed:

"Phase  IV  (July  1,  2003  through  June  30,  2004) [$945,000]  $983,075

"Phase  V  (July  1,  2004  through  June  30,  2005) [$770,000]  $1,151,000

"d.  Contract amount is INCREASED as follows:

"Amount of Contract after amendment 4 $3,364,200.00

"Amount of Amendment number 5          $319,075.00

"Amount of Revised Contract:          $3,783,275.00

"e.  * * *

"f.  In consideration of the changes agreed to herein as complete  equitable  adjustments  for  the  Contractor's performance of the work required by this Amendment, the Contractor hereby releases the State from any and all liability under this contract for further equitable adjustments to such facts or circumstances giving rise to the Amendment."

(Underscoring in original; emphasis added.)

Under  the  terms  of  the  parties'  agreement,  their relationship was to continue through June 30, 2007. At the end of Phase V, the 2004-05 academic year, the volume of tests began to exceed 594,321. Vantage continued to provide tests and also provided evidence at trial that it requested negotiations for a new pricing structure, as it believed was

required by paragraph 11.2, and that DOE rejected its requests.

The parties' relationship deteriorated in 2006 when DOE announced that it was placing the contract up for bid because DOE's contract with Vantage was expiring June 30, 2007. At that time, Vantage submitted invoices for past years' tests in excess of 540,292; DOE refused to pay them and advised Vantage that continued invoicing would damage Vantage's chances of winning the new contract. Vantage thus refrained from submitting invoices. DOE nonetheless ultimately disqualified Vantage from competing for the contract purportedly based on Vantage's failure to comply with technical requirements of the request for proposal (RFP).

After it had been disqualified, in October 2006, Vantage submitted written invoices for the additional tests, and when DOE failed to pay them, Vantage gave notice of its intention to terminate the agreement and ceased providing services in March 2007. DOE brought this action, seeking damages for Vantage's termination of the contract. Vantage brought counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing.

The dispute focused primarily on the italicized provision of Amendment A5 and its interplay with the rest of Amendment A5, and with the contract, in particular paragraph 11.2, which, again, provides, "Should DOE deliver more than 110% (594,321) of the base volume tests in any contract year (July 1 through June 30) DOE will enter into good faith negotiations with Vantage to establish a new pricing structure." Vantage asserted that, when, in 2004, testing numbers exceeded 594,321, DOE was required to negotiate a new pricing structure under paragraph 11.2. DOE pointed out that, when Amendment A5 was negotiated, the limit of 594,321 tests had already been reached or slightly exceeded. In light of that, in the state's view, Amendment A5, including the italicized provision ("*The limit of 500,000 tests is removed from the contract now there is no limit*"), read together with paragraphs c, d, and f, eliminated the limit on the number of tests and also satisfied any obligation to negotiate a new pricing structure under paragraph 11.2. In essence, the state

argued, Amendment A5 encompassed the new pricing structure.

Vantage conceded that the italicized provision of Amendment A5 eliminated any limit on the number of tests that Vantage would provide; but it asserted that that provision related only to Vantage's provision of *infrastructure and capacity* for unlimited testing. Vantage contended that the italicized phrase did not have anything to do with Vantage's right to be paid for tests and did not eliminate DOE's obligation to negotiate for a new pricing structure, as provided in paragraph 11.2, when the actual number of tests exceeded 110 percent of the base limit of 540,292. Vantage asserted, in essence, that the negotiations around Amendment A5 were about infrastructure for the capacity to provide additional tests and were not about the aggregate number of tests, that paragraph 11.2 remained in full effect, and that DOE breached the agreement as well as the implied duty of good faith and fair dealing when it refused to negotiate a new pricing structure.

The dispute thus came down to a question of contract interpretation. Did the italicized portion of Amendment A5 eliminate the contract's requirement under paragraph 11.2 to negotiate in good faith for a new pricing structure if the actual number of tests exceeded 594,321? In the state's view, when the italicized phrase is read in the context of the entire amendment, as well as the other provisions of the contract, the provision unambiguously prohibits additional payment and eliminates the requirement to negotiate under paragraph 11.2. Vantage asserted that, at a minimum, the contract is ambiguous on that point, because it can plausibly be read as Vantage reads it, to require negotiations for a new pricing structure when the number of tests exceeds 594,321, despite the absence of a limit on the total number of tests.

The trial court agreed with Vantage, concluding that the contract was ambiguous as to whether paragraph 11.2 remained in play. The trial court's conclusion that the contract was ambiguous influenced several rulings during the course of the trial. The court took testimony concerning the parties' intentions around Amendment A5 and ultimately submitted the issue to the jury as a question of fact. The jury

returned a verdict in favor of Vantage for $3,521,435.19, and the court entered judgment on that verdict.

On appeal, DOE assigns error to multiple rulings of the trial court stemming from its conclusion that the contract was ambiguous, including (1) its denial of DOE's motion for partial summary judgment on Vantage's claims for breach of contract and breach of the implied duty of good faith and fair dealing; (2) its denial of DOE's motion *in limine* to exclude evidence of a "per test" charge that was not provided for in the written contract and its ruling admitting evidence of a "per test" charge; and (3) its denial of DOE's motion for directed verdict and motion for JNOV. DOE also assigns error to the trial court's failure to give its requested instruction on waiver and to the court's instruction as to the basis for the award of damages.

We address first the question whether the contract was ambiguous. The state conceded at oral argument that, if the trial court was correct on that issue, then Vantage is entitled to prevail on appeal.

Oregon subscribes to the objective theory of contracts. The existence of a contract does not depend on the parties' uncommunicated subjective understanding but on their objective manifestations of intent to agree to the same express terms. *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 132, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007). In construing a contract, a court first examines the text of the disputed provision in the context of the contract as a whole; if the provision is unambiguous, the court construes it as a matter of law, and the analysis ends. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997).

A provision is ambiguous when it is reasonably susceptible to more than one meaning. *Id.* Extrinsic evidence regarding the circumstances underlying the formation of a contract may be considered to determine whether a contractual provision is ambiguous. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 316-17, 129 P3d 773, *rev den*, 341 Or 366 (2006).

If the court determines that the language in a contract is ambiguous, then resolving the ambiguity consistently

with the intentions of the contracting parties presents a question of fact for a factfinder. *Yogman*, 325 Or at 363-64. The interpretation of the factfinder is binding on appeal if there is any evidence in the record to support it. *Evenson Masonry, Inc. v. Eldred*, 273 Or 770, 772, 543 P2d 663 (1975); *Harnisch v. College of Legal Arts, Inc.*, 243 Or App 16, 259 P3d 67 (2011).

The trial court determined that the contract was ambiguous as to whether DOE was required to negotiate a new price structure when the number of tests exceeded 594,321. In the face of that determination, the state takes two separate tacks: (1) the elimination in Amendment A5 of any limit on the number of tests also eliminated the need to negotiate for a new price structure under paragraph 11.2; or (2) Amendment A5 satisfied or superseded paragraph 11.2 by providing the new pricing structure.

We begin by addressing each of the state's contentions regarding the question of ambiguity. First, with regard to the text of the italicized provision, the state acknowledges that the phrase eliminating the limit on the number of tests is not artfully drafted, and that "500,000" was not the correct *status quo* limit on tests—the contract itself, before the amendment, had a base limit of 540,292 and already provided for up to 594,321 tests. The state also concedes that the italicized phrase does not expressly state that there will be no payment for tests administered over 500,000. Nonetheless, the state points out that even Vantage concedes that the primary significance of the italicized phrase was to eliminate any limit on the number of tests.

The state notes that the other changes to the contract listed in the same paragraph all have dollar figures associated with them. For example, the second item on the list, "Increasing from 5,000 to 10,000 concurrent users upon third party certification 9/1/04" reflects the amount of $160,000. Because no amount is listed after the italicized provision, necessarily, the state contends, the parties must not have contemplated any additional cost for an unlimited number of tests. At oral argument, counsel for the state asserted the view that there was no additional cost stated for unlimited testing because the additional expense was encompassed

within the amount paid for the change in infrastructure to allow increased capacity.

Vantage replies that no dollar amount is associated with the elimination of the limit of the number of tests because that particular provision was concerned—as was all of Amendment A5—with the development of *capacity* for additional testing, rather than with the actual number of additional tests. Further, in Vantage's view, there is nothing inherently inconsistent with providing, on the one hand, that there will be no limit on the number of tests that Vantage will be able to provide and, on the other, providing in paragraph 11.2 that, if the number of tests exceeds 594,321 (already in excess of 500,000), the parties will negotiate for a new pricing structure. Vantage points out that Amendment A5 provided that "deleted language is indicated by brackets" and that, "[e]xcept as expressly amended above, all other terms and conditions are still in full force and effect." Not having been deleted by Amendment A5, Vantage contends, paragraph 11.2 remained in full force and effect.

The state's view that, in absence of a dollar amount associated with the italicized phrase, the parties contemplated no additional costs for additional tests, is certainly plausible. We agree with Vantage that there is no inherent contradiction between the italicized provision's statement that there is no limit to the number of tests that Vantage will provide and the requirement of paragraph 11.2 that, if the number of tests exceeds 594,321, the parties will negotiate a new pricing structure. Vantage's interpretation is also plausible.

In the state's view, when the italicized provision is viewed in the context of the entire amendment and the contract as a whole, Vantage's interpretation becomes implausible, because it becomes clear that the state had no further obligation to negotiate for a new pricing structure.

The state points, first, to the "not-to-exceed" provisions of the contract, which limited DOE's obligations to not more than a specific amount for each contract phase. The initial contract limited DOE's liability for the initial five years of the agreement to $3,179,600, "unless otherwise amended under the terms of Section 11." A final amendment executed

in May 2006 increased the total contract cost to DOE to "not to exceed" $6,038,510. The state asserts that, if Vantage is correct that it was entitled to negotiate for an additional amount for excess tests, then the total obligation would exceed the limit stated in the "not-to-exceed" clause.

As Vantage points out, however, the "not-to-exceed" clause is expressly subject to any amendment under the terms of Section 11, which includes paragraph 11.2. In light of that, we conclude that the "not-to-exceed" clause did not in itself preclude application of paragraph 11.2.

The state points out that the contract also included a provision stating that the contract was fully integrated and requiring that all obligations be in writing:

> "This Agreement, together with the exhibits attached hereto, constitutes the entire Agreement between the Parties with respect to the Services and all other subject matter hereof and merges all prior and contemporaneous communications with respect to such subject matter. It will not be modified except by a signed writing dated subsequent to the date of this Agreement and signed on behalf of Vantage and DOE by their respective duly authorized representatives. No waiver[,] consent, modification, or change in any term of this agreement will bind either party unless the same is in writing and signed by both parties and all necessary DOE approvals have been obtained. Such express waiver, consent, modification or change, if made, will be effective only in the specific instance and the specific purpose set forth in such signed writing."

As a fully integrated document, the state asserts, the contract unambiguously required a written amendment to add any additional payment obligation, and any agreement to pay for additional tests beyond 594,321 per contract year was required to be in writing. The state points out that Amendment A5 expressly left in full force and effect all other terms and conditions of the original contract, including the integration provision requiring that additional obligations be reduced to writing.

Vantage agrees that the contract is integrated and that Amendment A5 left in place all terms and conditions that were not amended, including the integration clause.

Vantage contends that the integration clause is not implicated by its claims, because it is not attempting to add to or change the contract, but only to enforce its current provisions. Vantage further points out that Amendment A5 made no change to paragraph 11.2. We agree with Vantage that the integration clause is of no assistance to the state in its contention that the contract is unambiguous or that paragraph 11.2 has been superseded.

Finally, the state asserts that Amendment A5, like all amendments before it, specifically waived or released any claims for additional costs that might arise out of the amendment but that were not included:

> "In consideration of the changes agreed to herein as complete equitable adjustments for the Contractor's performance of the work required by this Amendment, the Contractor hereby releases the State from any and all liability for further equitable adjustments attributable to such facts or circumstances giving rise to the Amendment."

The state notes that, among the changes that were agreed to by the amendment was the lifting of any limit on additional tests. Accordingly, by the above provision, the state asserts that Vantage specifically released the right to claim additional compensation, a type of equitable adjustment, for those tests. Vantage counters, once again, that the scope of Amendment A5 was about providing capacity for additional testing and had nothing to do with the contract's requirement for negotiations in the event that the number of tests exceeded 110 percent of the base limit.

Once again, we conclude that Vantage offers a plausible interpretation of the contract. If, as Vantage contends, Amendment A5 was only about providing for additional testing capacity, then the release provision would only relate to the state's liability for equitable adjustments related to that performance and would not prevent Vantage from seeking to implement paragraph 11.2.

Having reviewed the parties' contentions with regard to the trial court's determination that the documents were ambiguous, we conclude that both the state and Vantage offer plausible interpretations of the contract and Amendment A5 and that the trial court therefore correctly

held that the contract and Amendment A5 are ambiguous as to whether DOE was required to negotiate with Vantage pursuant to paragraph 11.2. We conclude, therefore, that the court did not err in submitting that question to the jury as factfinder. In light of the state's concession that the resolution of that question is dispositive, we do not reach the state's other assignments of error.

Affirmed.